UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| BRANDON CHANG, et al., ) | Civil Action |
| Plaintiffs, ) | No. 24-2377 |
| vs. ) | |
| ) | |
| UNITED AMERICAN SECURITY, LLC ) | February 24, 2026 |
| doing business as GARDAWORLD, ) | 9:04 a.m. |
| Defendant. ) | Washington, D.C. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES**</u>:

FOR THE PLAINTIFFS:
    JUSTIN DEREK ZELIKOVITZ
    JONATHAN PHILIP TUCKER
    Dcwage Law
    519 H Street NW
    Washington, DC 20001
    (202) 803-6083
    justin@dcwagelaw.com
    jt@dcwagelaw.com

FOR THE DEFENSE:
    TERESA L. JAKUBOWSKI
    ADAM CALANDRA
    Barnes & Thornburg LLP
    555 12th Street NW, Suite 1200
    Washington, DC 20004
    (202) 289-1313
    teresa.jakubowski@btlaw.com
    adam.calandra@btlaw.com

Court Reporter: Elizabeth Davila, RPR, FCRR
                Official Court Reporter

This transcript is work product.  This transcript shall be
considered null and void if the transcript is edited, printed,
disassembled, screenshot, and/or copied in any manner by any
        party without authorization of the signatory.

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Your Honor, this is Civil Action 24-2377, Brandon Chang, et al. versus United American Security, LLC.

Would the parties please come forward to the podium and identify yourselves for the record this morning. We'll start with plaintiffs' counsel first.

MR. ZELIKOVITZ:  Good morning, Your Honor. Justin Zelikovitz on behalf of the plaintiffs, and with me I have Jonathan Tucker of my firm.

THE COURT:  Yes.  Good morning.

MS. JAKUBOWSKI:  Good morning, Your Honor. Teresa Jakubowski for defendant.  My colleague Adam Calandra has a hearing in another case, but he will be joining us after that is complete.

THE COURT:  All right.  So yesterday we had the development, of course, of the defendant seeking to withdraw its motion for disqualification which the plaintiffs -- for a very good reason, although relieved, opposed, given the fact that the damage has been done; disqualification motion for tactical reasons, and to impugn the plaintiffs' firm's integrity and ethics, and to chill their communications that might be appropriate with employees of defendant, given the first ground or primary ground for the disqualification motion; meaning that plaintiffs' firm had engaged in

*ex parte* communications that violated ethics rules.  That's one of the first things I want to take up today.

Given the sound and excellent reasons that the plaintiffs' firm have said that they oppose withdrawal of the motion, I am going to deny withdrawal of the motion.

I also think plaintiffs may want to seek attorney's fees for having to respond to this motion depending on how I resolve the merits of it.

Am I correct on that?

MR. ZELIKOVITZ:  Your Honor, we're very thankful for the Court's time, and very much following their lead.  But, yes, if the Court is disposed to do that, we would seek that.

THE COURT:  All right.  So that requires resolution of the motion on the merits which is, I think, what plaintiffs' counsel, I understood -- in the flurry of lots of other things going on in my courtroom yesterday -- that plaintiffs' are seeking.

Am I correct about that?

MR. ZELIKOVITZ:  Yes, Your Honor.

THE COURT:  To resolve the merits of the disqualification motion, I have a few questions.

Defense counsel, stand on up, please.

(Whereupon, the Court addresses the IT staff.)

THE COURT:  So I am going to start with the

claimed ethical violation by plaintiffs' firm of 4.2 which -- according to the defense motion, it is described, I guess, multiple times, as an egregious violation of 4.2. So I really want to dig down into that.

The parties describe the two employees that were called; Tella Jones [sic] and Tamekia Wallace with different names. The defendants call them Gardaworld managers and supervisors. So what is the difference between a manager and supervisor in the Gardaworld?

MS. JAKUBOWSKI: Basically, it's the number of different sites at a potential time they may be overseeing.

THE COURT: Okay.

MS. JAKUBOWSKI: As the one -- if I could --

THE COURT: Plaintiffs' counsel calls them site supervisors. Is it fair to say that Tella Jones and Tamekia Wallace both supervise single sites?

MS. JAKUBOWSKI: One of them was a site supervisor, the other one was an account manager.

THE COURT: Okay. Account manager. Tamekia Wallace was the account manager?

MS. JAKUBOWSKI: Yes. Ms. Wallace.

THE COURT: Are both Tella Jones and Tamekia Wallace paid on an hourly basis?

MS. JAKUBOWSKI: Yes, they are, Your Honor.

THE COURT: Did you, as counsel for the defendant,

learn about the existence of Tella Jones and Tamekia Wallace and who they were after your client reported to you that these two individuals had been contacted by plaintiffs' firm?

MS. JAKUBOWSKI:  Yes.  That was the first time.

THE COURT:  Okay.  So do you -- during the course of this litigation, you had not otherwise spoke -- before that point, you had not spoken to Tella Jones or Tamekia Wallace?

MS. JAKUBOWSKI:  I personally had not.  I would have to check with the other members of my team that were also working on this.  But standing here right now, I cannot say that any of us had prior contact with --

THE COURT:  You can, by noon today, give me the answer to that question.

MS. JAKUBOWSKI:  Okay, Your Honor.

THE COURT:  Now, the plaintiffs' opposition summarizes some of the senior people at Gardaworld.  And they say that Gardaworld is owned by D.C. Partners, which is a private equity firm.  It has regional operating subsidiaries, including Gardaworld United American Security, LLC, which is managed by a person named Kathleen Brinker, who is director of human resources for the eastern region covering five states and D.C., and Jonathan Piccolo, who is the area vice president of the D.C. branch; and reporting to

Mr. Piccolo are account managers like Emmanuel Johnson.

Is that description generally accurate?

MS. JAKUBOWSKI:  Yes, Your Honor.

THE COURT:  Okay.  So of the people mentioned, Kathleen Brinker, Jonathan Piccolo, and Emanuel Johnson, do you, as defendant's counsel, consult with them or more senior management than even those three named individuals when you are getting clearance from your client in certain -- take certain litigation strategy?

MS. JAKUBOWSKI:  To my personal knowledge, for sure we have consulted with Kathleen Brinker and Joseph Piccolo.  I personally haven't consulted with Emanuel Johnson.

THE COURT:  Is Emanuel Johnson, as an account manager, also an hourly worker?

MS. JAKUBOWSKI:  Yes, he is, Your Honor.

THE COURT:  And are you aware of whether or not the personnel with whom you must consult for guidance on how to conduct this litigation with your client -- are those personnel paid on an hourly basis or on a salary basis?

MS. JAKUBOWSKI:  Our main point of contact on this is their internal counsel as well.

THE COURT:  Their internal counsel?

MS. JAKUBOWSKI:  Yes.

THE COURT:  Okay.  His main point of contact, is

that person paid on an hourly basis or a salary?

MS. JAKUBOWSKI:  I do not know, Your Honor.  I would presume salary.

THE COURT:  By noon today, you can let me know.

MS. JAKUBOWSKI:  Okay.

THE COURT:  Because wouldn't you generally agree that corporate management, with the authority to guide litigation with outside counsel, are usually salaried and not the hourly workers?

MS. JAKUBOWSKI:  Yes, Your Honor; but I just don't want to presume.  I want to speak from certainty.

THE COURT:  Okay.  So you will submit that to me by noon today.

MS. JAKUBOWSKI:  Yes.

THE COURT:  Does the fact that both Tella Jones and Tamekia Wallace are paid on an hourly basis serve as some indication of where they stand in the corporate hierarchy as management no matter what their title is of supervisor or account manager?

MS. JAKUBOWSKI:  Your Honor, it certainly goes to the level of management that they would be at.  But when we were interpreting Rule 4.2, we were interpreting it as people who could make binding admissions with regard to matters in the litigation.  And because the site supervisors and the account managers are the ones who author the post

orders and dealing with the client and setting what the actual job site duties are, which is one of the critical issues in this case, that is why we felt that contact of them came within the ambit of Rule 4.2.

THE COURT:  Okay.  What you have just said is very slippery, and you can imagine I am a little bit skeptical of what is said by this defendant and its counsel right now. So that's a little slippery.  Let's get into the detail about what you are saying their authority is.

Do Tella Jones and Tamekia Wallace have the authority to negotiate contract terms with the clients of the defendant?

MS. JAKUBOWSKI:  Only with regard to job duties, that's my understanding.

THE COURT:  They have the authority to go to their client and say, you know, that's an ambiguous contact term; this is how I am interpreting it, and that's binding on the services we're going to provide.

Tella Jones and Tamekia Wallace, as hourly workers, have the authority to interpret contract terms between defendant and its clients and articulate that to the client?

Is that what you are saying?

MS. JAKUBOWSKI:  I wouldn't describe it as they're negotiating the overarching contract that governs the

relationship, but that contract speaks in term of generalities.

THE COURT:  Were they involved in the contract negotiations with those clients?

MS. JAKUBOWSKI:  Your Honor, I would have to verify.  I do not believe they were involved --

THE COURT:  I hope you are keeping track or you have somebody here helping you keep track of everything you are supposed to be giving me by noon today.

MS. JAKUBOWSKI:  Correct.  But to put on the record, it is our understanding that their authority only went toward negotiating the terms of the post orders and setting the actual duties for the employees working on the particular sites they were supervising.

THE COURT:  So I am understanding the slippery line that you just said, they have the ability to negotiate that with the client directly?

MS. JAKUBOWSKI:  Yes, Your Honor.

THE COURT:  Where does Tella Jones work and where does Wallace work?

MS. JAKUBOWSKI:  Your Honor, if I could grab my binder --

THE COURT:  Does plaintiffs' counsel know?

MR. ZELIKOVITZ:  I don't.

MS. JAKUBOWSKI:  I believe Ms. Wallace is at NBC

Studios and Ms. Jones -- I'm sorry, I just can't recall off the top of my head.

MR. ZELIKOVITZ:  She's at the Sirius XM building, Your Honor.

THE COURT:  Oh.  Wow.  So this is quite the job for Ms. Jones and Ms. Wallace.  Ms. Jones can go to Sirius XM and negotiate terms of service under that contract.  And Ms. Wallace, based on what you have just said, can go to NBC Studios and negotiate the terms and how they are going to carry out the terms of the contract.  That's what you are saying?

MS. JAKUBOWSKI:  I am saying that's the level where they define what the particular duties are that the employees on that site do.

THE COURT:  Okay.  I want you to have a declaration, submit it by whoever your main point of contact is, confirming what you have just told me that Tella Jones has the authority to negotiate the terms of service under the contract with Sirius XM and that Tamekia Wallace has the authority, as an hourly worker, to negotiate the terms of service under the contract that defendant has with NBC Studios, because that's quite a statement.

All right.  So if Tella Jones or Tamekia Wallace were to tell you, as counsel to the defendant, that they want you to settle this case, would that be good enough for

you or would you have to go to somebody else?

MS. JAKUBOWSKI:  We would have to consult their internal counsel.

THE COURT:  So that would not be good enough for you?

MS. JAKUBOWSKI:  No, Your Honor.

THE COURT:  So they don't have the authority to guide the major decisions to take place on behalf of the defendant as the client in this litigation?

MS. JAKUBOWSKI:  Your Honor, we did not represent that they did.  What we said was that they had the authority to set and negotiate critical terms that would be binding on the company.

THE COURT:  Okay.  Now, Rule 4.2 prohibits *ex parte* communications with parties who are represented, which includes an employee of an organization if that employee has the authority to bind an organization as to the representation to which the communication relates.

Commentary makes clear that the rule doesn't prohibit a lawyer from commuting with employees of an organization who have the authority to bind an organization with respect to the matters underlying the representation if they do not also have the authority to make binding decisions regarding the representation itself.

So would you agree that this commentary is

designed to apply the rule to company personnel with management authority sufficient to make binding decisions about the litigation to avoid confusion as to who is a manager subject to the *ex parte* communication bar in 4.2, based on the fluidity of titles that may be handed out by a company and calling somebody a manager, calling somebody a supervisor.  But if they don't have the authority to bind the company with respect to the pending litigation, it doesn't matter what their company decides to call them to inflate their egos, perhaps to make up for their lack of salary or hourly wage?

No matter what they're called, this is the test of whether they're subject or not to the 4.2 communications bar; would you agree?

MS. JAKUBOWSKI:  Well, as we said in our motion, we are interpreting Rule 4.2.  And we believe there is a good faith basis to state that the operative contact should be somebody with authority to bind the company with regard to the subject matter content that is being made.

THE COURT:  Yes, in a footnote.  In a footnote in your papers, the defendant conceded that D.C. allows for direct solicitation of nonmanagerial employees.  That was in your motion, page 9, Footnote 7.

4.2 literally defines nonmanagerial employees who may receive direct solicitations as those who have no

authority to make binding decisions regarding the representation itself; is that right?

MS. JAKUBOWSKI:  That is what the comment says.  But when you read the preamble --

THE COURT:  So what you are really asking me to do is ignore or disregard the commentary to the ethical rules that apply in this jurisdiction?

MS. JAKUBOWSKI:  Well, Your Honor, the scope in the preamble section to the rule states that the comments are, you know, instructive only; they're not controlling.

We also did a case law search to see if there was any circumstance where that rule had been applied in circumstances analogous to this and did not find any in D.C.

THE COURT:  Have you found any court that has basically said:  I don't care what the commentary says, it's not binding and I am not going to follow it?

Have you found any court case on that?  Because you didn't cite it.

MS. JAKUBOWSKI:  No, Your Honor.  But again, it was instructive but not controlling.

THE COURT:  So are Ms. Jones and Ms. Wallace responsible for deciding which employees work as security officers for the defendant?  Do they have hiring authority?

MS. JAKUBOWSKI:  No, Your Honor.

THE COURT:  Do they have firing authority?

MS. JAKUBOWSKI:  I do not believe they do, Your Honor.  All of that was coordinated through central HR.

THE COURT:  What?

MS. JAKUBOWSKI:  I believe all of that is coordinated through central HR.

THE COURT:  So they don't have hiring and firing authority.  But nonetheless, based on what you have told me here this morning, they have the authority to negotiate with Sirius XM and NBC Studios on behalf of defendant as to the meaning of terms under the contract?

Do I understand that correctly?

MS. JAKUBOWSKI:  Correct.  The scope of duties for sure, with regard to what individual employees perform at that work site.

THE COURT:  So what that means is that they are responsible for communicating to other employees of defendant at those sites what the job tasks are; is that right?

MS. JAKUBOWSKI:  Right.  After communicating with the client and discussing with the client what the needs are.

THE COURT:  So they have the ability, if the client -- if NBC Studios or Sirius XM says:  We think the security guards' tasks include all of these areas within the building; and Ms. Wallace and Ms. Jones have the ability to

say to NBC Studios and Sirius XM:  Nope, we only have to cover four of the doors, not all ten of the doors.

They have the ability to do that?  They have the authority to do that?

MS. JAKUBOWSKI:  You know, I would want to verify that before I answer.

THE COURT:  Okay.  Please verify that; what the extent of their authority is.

But there is certainly -- so you -- let me just understand completely what your argument here is.

Is your argument that Ms. Jones and Ms. Wallace are the level of managerial personnel subject to the 4.2 communications bar or not?

MS. JAKUBOWSKI:  Yes, that's the basis on which we made our motion.

THE COURT:  That they are?  Notwithstanding -- so with your statement of that, you are also saying that they have the authority to make binding decisions regarding the representation itself in this case?  Because that is what the scope of Rule 4.2 covers.

MS. JAKUBOWSKI:  Your Honor, we were interpreting that as to representation as to the subject matter in question.

When we did ethics opinion research and looked at Ethics Opinion 80 as well as 340, it contains language in

that, as well as the dissident. And Ethics Opinion 129 talks about making admissions that can be binding on the company, and it's our position that these employees can.

THE COURT: And what is the full scope of what these employees -- Ms. Wallace and Ms. Jones, what is the full scope of their authority to bind the defendant in terms of their negotiations with Sirius XM and NBC Studios?

MS. JAKUBOWSKI: They are the ones that are setting what specific duties are performed by the employees in each of those work sites.

THE COURT: Would you concede that to the extent I don't buy this argument at all, and that these are not -- these hourly workers making $24 and a few cents per hour are not employees who can -- who are covered by the 4.2 communications bar, that the communication that plaintiffs' firm had with them complied with the rule of identifying themselves as the plaintiffs' firm and that those prerequisites were met here by their own declarations?

MS. JAKUBOWSKI: Your Honor, I understand that you disagree with us, but that was our good faith conclusion. And like I said yesterday, we ran that by our internal general counsel's office before filing that motion.

THE COURT: Your internal general counsel's office. You mean within your firm?

MS. JAKUBOWSKI: Yes.

THE COURT:  So the defendant requests -- let me just step back, because this would be quite the interesting consequence as a policy matter.  If this Court accepted the arguments being pushed by this defendant and said whatever exceptions to the 4.2 communications bar are set out in the ethical rule that applies, I am not going to find it binding.  Even if everybody -- all the lawyers practicing here in good faith try and comply with that, I am going to ignore it, and I am going to find that the -- because what you are pushing -- what the defendant is pushing is a communications bar under 4.2 that applies to all employees at a corporation once that organization is in litigation.

Is that what you are pushing here?

MS. JAKUBOWSKI:  No, Your Honor.

We are -- as we said in our papers -- advocating the test that a number of other jurisdictions have used, the managing speaking test, where -- admittedly, that is more in line with the ADA model rule which basically says everybody at a managerial, supervisory level, as well as people that can make binding admissions as well as people who make decisions about the litigation.

THE COURT:  So binding decisions about -- okay.  But what you would say is that -- so if this organization -- if defendant made everybody who worked there -- gave them all a title, supervisor or manager, you would -- that act

would put them off limits from being able to receive phone calls to help vindicate their own wage and hour rights; is that right?

Is that basically what you are arguing?

MS. JAKUBOWSKI:  No, that's not what we're saying. That's not what we're saying.

In this particular case, both of these individuals not only had the titles, they performed supervisory and account managing functions.  So you can't just -- an employee can't just give --

THE COURT:  But you don't -- the other account manager who I mentioned -- you said you talked to the HR director, but you don't -- and the internal counsel; but you don't talk to that other account manager.  And you didn't even know about these two account managers until they got solicitation calls.  So it's not like you ever consulted with them about representation in this litigation, right?

MS. JAKUBOWSKI:  Well, Your Honor, you know, the account managers, the site supervisors we deal with are the ones who have an active case involving their work site.  And granted, there are 18 cases; but the Chang case only recently came back from the whole arbitration process.  And we only filed joint status reports to figure out where to go at the next stage.

So prior to that our communications were with

those individuals who were with the actual work sites that were targeted in the separate individual cases.

THE COURT:  So the plaintiffs' opposition points out that although the defendant is seeking preliminary injunctive relief, you haven't addressed all of the factors for injunctive relief.  So why is that?

How would you even be entitled to injunctive relief if you haven't shown a hardship and irreparable harm, and so on?

I mean, you haven't even addressed those factors.  Is that just, like, a throwaway part of your brief, to throw around words like "preliminary injunctive relief," ask for fairly extraordinary relief, putting -- you know, stopping -- without -- and you want me to do the work for you, to figure out whether you meet all of the injunctive factors?

MS. JAKUBOWSKI:  With apologies to Your Honor, we put that in there as a basis to say:  This is an alternative way to cure the harm; it's to prevent them from contacting people that were at the managerial and supervisory level.  We were thinking of this in more the terms of the Court's assistance and setting guardrails so that the parties had a uniform understanding going forward of what was fair game and what wasn't fair game.

THE COURT:  All right.  It's 9:30.  You can step

back because I need to start the criminal trial.  I will take you up at some other point during the day when I have a moment.

(Whereupon, this matter recessed until 1:11 p.m.)

THE COURTROOM DEPUTY:  Resuming Civil Action 24-2377, Brandon Chang, et al. versus United American Security LLC.

THE COURT:  All right.  Defense, stand on up.

We got no filing from you at noon today.  What's going on at your firm?  They are not working today?

MS. JAKUBOWSKI:  It took a little while to coordinate with the client, but we filed it right before coming back in here for this.

THE COURT:  Oh.  When I looked at the docket, it had not been filed before.

How many employees does the defendant have?  Because in evaluating the vexatiousness of 18 complaints, I want to know.  That's in the context of -- your client has 100 employees, or how many?

MS. JAKUBOWSKI:  I mean, our firm has, I think, in the neighborhood of 800 attorneys --

THE COURT:  The defendant has 800 attorneys?

MS. JAKUBOWSKI:  I thought you were talking about the firm.

THE COURT:  No, the defendant.

MS. JAKUBOWSKI:  Do you know how many employees they have?

(Whereupon, defense counsel confer.)

MS. JAKUBOWSKI:  500.  We were getting --

THE COURT:  Your client, UAS, has 500 employees?

MS. JAKUBOWSKI:  Nationwide, right?

MR. CALANDRA:  In the division.

THE COURT:  I don't know what a division is.  I don't know what he's talking about.

MS. JAKUBOWSKI:  Yes.

THE COURT:  Okay.  I want all of that information.  I mean, you look online and UAS is, like, 120,000.  So 500 sounds like another slippery statement from defense counsel.  Why am I getting 120,000 online, and you are telling me 500?

MS. JAKUBOWSKI:  I think my colleague was answering with respect to the unit that operates here in this area.  Okay.

THE COURT:  I want the number of employees that Gardaworld or UAS has.  You can break it down however you want.  But if it's got 120,000 employees and they have got 18 complaints, that's a little -- it strains credulity that that's so vexatious for this company.  More crocodile tears?

Okay.  So I think you said, Ms. Jakubowski --

MS. JAKUBOWSKI:  Jakubowski, Your Honor.

THE COURT:  -- Ms. Jakubowski, that your firm had

filed a motion for discovery.

Did I hear that correctly, under 56(d)?

MS. JAKUBOWSKI:  We filed a Rule 56(d) declaration of the additional discovery that would be --

THE COURT:  I see.  Okay.  So there was no hammer on the docket.  And the declaration, as noticed on the docket, basically said declaration of Adam Calandra.  It didn't say anything on the docket about -- pursuant to Federal Rule of Civil Procedure 56(d).  I was just curious -- I was not going to notice that until I got into the substantive papers.

Okay.  So let's get back to this.

MS. JAKUBOWSKI:  Your Honor, I have the answer to those two questions that you asked.

THE COURT:  Sure.  Well, it's in writing, right?

MS. JAKUBOWSKI:  I said that the declaration --

THE COURT:  Are you submitting -- are you filing something on the docket?

MS. JAKUBOWSKI:  You asked for a declaration on the specific two items, about the site supervisor and account manager authority.  And then you just asked me to get the answer to:  Did anyone at our firm have prior contact with Ms. Jones or Ms. Wallace prior to --

THE COURT:  Yes.  So what is the answer to that?

MS. JAKUBOWSKI:  The answer to that is no.

THE COURT:  All right.

MS. JAKUBOWSKI:  The other outstanding question was, is the --

THE COURT:  Brinker and Piccolo are hourly waged or salary?

MS. JAKUBOWSKI:  General counsel, that is salary.

THE COURT:  So for Kathleen Brinker and Jonathan Piccolo, both salaried?

MS. JAKUBOWSKI:  I thought we were talking about the general counsel.

THE COURT:  That was also one.  But Kathleen Brinker and Jonathan Piccolo, I think you said you thought they were also salaried and not hourly workers.

Okay.  So you will confirm that.

MS. JAKUBOWSKI:  Yes.

THE COURT:  Also, the extent to which Ms. Jones and Ms. Wallace negotiate with clients of the defendant and, specifically, could they decline to provide services requested by the client guarding only some doors of the office building, so that they can interpret the terms of the contract all by their big selves.

MS. JAKUBOWSKI:  We did not phrase it that way.

You had asked for something about terms of service.  So we did specify, again, it's in the context of the post orders.

THE COURT:  I don't know what "post orders" are. What are you talking about with post orders?

It's, like, on-site directions from a supervisor to where a security guard goes on a particular day or their schedule?

MS. JAKUBOWSKI:  It's the --

THE COURT:  Where they are posted within the building?

MS. JAKUBOWSKI:  It's some understanding of what the very specific job duties are that are performed at that work site.

THE COURT:  And Jones and Wallace get to look at the contract with the site client, and they get to look at the contract and look at the contract terms and say:  This is what that means.  They have that authority, that's what you are saying?

MS. JAKUBOWSKI:  Your Honor, I am saying they understand -- again, because the contract talks in generality.  They understand the generality of the authority --

THE COURT:  And they have the authority -- I am going to put this in a written memorandum opinion based on what you are telling me here today.  Your client can go berserk, or not.

So you keep trying to push Jones and Wallace into

this authority position of management to get out from under 4.2, and you are doing your darnedest to do that, to defend your work product.  And I think you are just turning yourself into knots from where I sit.  But I am going to hold you to it, Ms. Jakubowski.  I am going to hold you to it.

I am understanding now from you that Jones and Wallace may be $24 per hour hourly workers, have the authority to take the contract that your client has negotiated with Sirius XM and NBC Studios, look at the contract terms themselves -- I don't know what their educational level is -- look at those contract terms and decide themselves what the terms of those contracts mean for their duties under the contract and then supervise the people who are designated -- over whom they have no firing or hiring authority -- tell them how to comply with those contract terms; that is what you keep telling me, and I will accept that -- and evaluate the application of 4.2's communications bar -- *ex parte* communications bar on represented management employees under that interpretation.

Okay.  Because you keep saying they have got all of this authority, so I am going to credit them with that at $24 an hour, plus some change.

MS. JAKUBOWSKI:  I hope when you read the declaration it clarifies --

THE COURT:  I have read their declarations, and it doesn't say that.

MS. JAKUBOWSKI:  I mean the declaration that's coming in for Mr. Jonathan Piccolo.

THE COURT:  Okay.  And he is a salaried employee?

MS. JAKUBOWSKI:  We believe so, yes.  He is the area vice president of operations.

THE COURT:  And if you settled this case today, you would call Mr. Piccolo and get his clearance to do that or you would call someone else?

He has management authority -- he himself, Mr. Piccolo, has management authority over this litigation?

MS. JAKUBOWSKI:  He is our -- we have two main points of contact, what we call a business side and a legal side.  He is our legal and our business point of contact, and the general counsel's office is the legal.

THE COURT:  Okay.  All right.  I think I have already discussed with you the Northern District of California case of *Lou*, and why it is you didn't mention *Sandoval*.  And your excuse for that is -- what? -- you just missed it?

You missed *Sandoval*, the other Northern District of California case that makes it clear that counsel can represent both a class -- a proposed class and individual plaintiffs on the same claims when their claims are

consistent with each other?

MS. JAKUBOWSKI:  Your Honor, as I said yesterday --

THE COURT:  You missed that one?

MS. JAKUBOWSKI:  -- I did not personally do the research.  I reviewed the brief before it went in.

THE COURT:  Okay.  And you are going to get for me the exact number of employees -- anyway you want to break it down -- total for the defendant, and any other numbers underneath that.

You are going to get that to me because you have also alleged a violation of D.C. Rule of Professional Conduct 4.4(a), with demonstrable misuse of the judicial process designed to harass defendant with litigation costs and approved statutory attorney's fees that far exceed the amounts in controversy when, as plaintiffs' contend, this rule doesn't apply to an opposing party but only to third parties; that's how it reads.

I have been very curious.  Why do you think that this rule applies to the opposing parties?  Is that another one where I am just supposed to ignore the terms of the rule or any commentary to the rule and just make it up on my own?  Is that what you are suggesting?

MS. JAKUBOWSKI:  Your Honor, I believe we did cite a case for that.

THE COURT: Your defendant's motion at page 13, if you are looking for where you talked about that.

You just want me to rewrite the professional rules?

MS. JAKUBOWSKI: I think it might be addressed in our reply, Your Honor.

THE COURT: Okay. You also cited: Plaintiffs as violating Rule 3.3 requiring candor to the Court, which is something I would remind you of; candor to the Court required.

I think for that -- I think that that is part of your complaint that they used, the pro se complaint -- the interim decision without citing the revised interim decision, both of which found against the defendant; is that right? That was the violation of 3.3?

MS. JAKUBOWSKI: Yes. And the fact that the initial version they relied on was redacted.

THE COURT: Right. Which you now concede they didn't know?

MS. JAKUBOWSKI: I understand that they didn't do --

THE COURT: Right.

MS. JAKUBOWSKI: -- but we think it was misleading to quote a redacted document.

THE COURT: Okay.

MS. JAKUBOWSKI:  Given that there were some critical parts of that that were redacted and germane to this case.

THE COURT:  And then -- all right.  So I have got to go back to my trial.

This is what we're going to do here.  I am going to deny the defendant's motion to withdraw their disqualification motion given the context here which I have already explained -- and plaintiffs' counsel already has eloquently explained -- the need for a dispositive ruling on that disqualification motion given the reputational harm that is derived from that disqualification motion.

I am also going to deny the disqualification motion with opinion to follow -- for why it needs to be denied, for so many different reasons; some of which I have touched on, some of which I don't have time to because I have a jury waiting; the citizens of the District of Columbia taking time out of their day to come here to hear a criminal case.

I want to set a schedule for the plaintiffs' requested motion for fees in connection with this disqualification motion.

With respect to the plaintiffs' motion which asked for an emergency hearing, it's been granted to that extent.

The plaintiffs' motion also asked to quash the 18

deposition notices, which I have stayed; so I need not resolve that. And I am not going to resolve that until I get to the substantive motions with which defendants have asked for the depositions. The timing of those deposition notices will play a big role in my consideration of why the disqualification motion is being denied.

A schedule for plaintiffs' motion for fees in connection with the time spent on dealing with this disqualification motion, I would suggest that plaintiffs' motion be due on March 3rd, a response by March 6th, and a reply by March 10.

Do you need more time?

Speak now, or that's going to be the schedule.

MR. ZELIKOVITZ: Your Honor, can we get -- as Your Honor might imagine, we're behind, just like Your Honor is. If we can get 7 additional days, we'd really appreciate it because we're behind on everything at this point.

THE COURT: Fine. So that would make it -- I am going to have my law clerk figure out the schedule then. March 10, and then response will be 5 days after that, by a firm of 800 people.

And the reply, a week after that? 5 days after that?

MR. ZELIKOVITZ: Yes, Your Honor.

THE COURT: Fine.

Okay.  With that, you are all excused from my courtroom.

MS. JAKUBOWSKI:  Thank you.

THE COURT:  I will expect more replies about the total number of employees in order to evaluate your vexatious -- repeated accusation of vexatious litigation, with plaintiffs trying to vindicate their wage and hour rights.  Nor more need be said about that, the merits of that.

MS. JAKUBOWSKI:  Thank you, Your Honor.

THE COURT:  Okay.  You are all excused.

MR. TUCKER:  Thank you.

(Whereupon, the proceeding concludes, 1:34 p.m.)

**CERTIFICATE**

I, ELIZABETH DAVILA, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 3rd day of March, 2026.

/s/ Elizabeth Davila, RPR, FCRR
Official Court Reporter