**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BRANDON CHANG, *et al.*,

           Plaintiffs,

      v.

UNITED AMERICAN SECURITY, LLC
d/b/a GARDAWORLD,

           Defendant.

REGINA MERRITT,

           Plaintiff,

      v.

UNITED AMERICAN SECURITY, LLC
d/b/a GARDAWORLD,

           Defendant.

Consolidated Civil Action Nos. 24-2377 and
24-3592 (BAH)

Judge Beryl A. Howell

**MEMORANDUM OPINION**

These two consolidated actions each involve allegations asserted by a total of three named

plaintiffs that United American Security, LLC, a private security company doing business as

GardaWorld, "failed to timely pay" its plaintiff employees the minimum wage and fringe benefits

for "security officers," in violation of the D.C. Wage Payment and Collection Law ("DCWPCL").

Third Am. Class Action Compl. ("*Chang* TAC") ¶ 83, ECF No. 41; First Am. Class Action Compl.

("*Merritt* FAC"), *Merritt*, No. 24-cv-3592 (BAH), ECF No. 27.[1]  A total of seven motions are

---

[1]    *Chang* has two named plaintiffs and *Merritt* has a single named plaintiff.  Post-consolidation, all filings for either or both cases were filed on the *Chang* docket.  *See* Minute Order (Sept. 12, 2025) (consolidating cases and directing all filings to be made on *Chang* docket).  All docket numbers refer to the *Chang* docket unless specified as being posted, pre-consolidation, to the *Merritt* docket by the designation "*Merritt*" immediately prior to the ECF number.

1

pending in these two cases, both of which contain class allegations and require untangling a web of statutory and regulatory provisions set out in District of Columbia and federal law. Amid this litigation over substantive issues, defendant diverted the attention of the Court and opposing counsel to a legally questionable, tactically timed, and reputation impugning motion to disqualify plaintiffs' counsel that was denied, and plaintiffs now seek sanctions in the form of attorneys' fees associated with the briefing and hearing necessitated by defendant's motion.

In *Merritt*, defendant has moved to dismiss for failure to state a claim. Def.'s Mot. to Dismiss ("Def.'s *Merritt* MTD"), *Merritt* ECF No. 30; Pl.'s Opp'n to Def.'s *Merritt* MTD ("Pl.'s *Merritt* MTD Opp'n"), ECF No. 37; Def.'s Reply in Support of *Merritt* MTD ("Def.'s *Merritt* MTD Reply"), ECF No. 38. In *Chang*, three motions are pending: (1) defendant's motion to dismiss for failure to state a claim, Def.'s *Chang* Mot. to Dismiss ("Def.'s *Chang* MTD"), ECF No. 47; Pls.' Consol. Br. Reply Support of *Chang* MPSJ, Opp'n to Def.'s Mot. to Strike MPSJ Exs. & Opp'n to Def.'s *Chang* MTD ("Pls.' *Chang* MTD Opp'n"), ECF No. 62; Def.'s Consol. Reply in Support of *Chang* MTD & of Mot. to Strike MPSJ Exs. ("Def.'s *Chang* MTD Reply"), ECF No. 69; (2) plaintiffs' motion for partial summary judgment as to Count I of their Third Amended Complaint, Pls.' Mot. for Partial Summ. J. ("Pls.' *Chang* MPSJ"), ECF No. 42; Def.'s Opp'n to Pls.' MPSJ ("Def.'s *Chang* MPSJ Opp'n"), ECF No. 50; Pls.' *Chang* MTD Opp'n (also replying in support of motion for partial summary judgment); and (3) defendant's motion to strike certain exhibits attached to plaintiffs' motion for partial summary judgment, Def.'s Mot. to Strike Exs. from Pls.' *Chang* MPSJ ("Def.'s *Chang* MPSJ Strike Mot."), ECF No. 48; Pls.' *Chang* MTD Opp'n (also opposing motion to strike); Def.'s *Chang* MTD Reply (also supporting motion to strike).

Three additional motions are common to both cases: (1) plaintiffs' motion for class certification, Pls.' Mot. to Certify Class ("Pls.' Class Cert. Mot."), ECF No. 44; Def.'s Opp'n to

2

Pls.' Class Cert. Mot. ("Def.'s Class Cert. Opp'n"), ECF No. 55; Pls.' Reply in Support of Class Cert. ("Pls.' Class Cert. Reply"), ECF No. 70; (2) defendant's motion to strike certain exhibits attached to plaintiffs' motion for class certification, Def.'s Mot. to Strike Exs. from Pls.' Class Cert. Mot. ("Def.'s Class Cert. Strike Mot."), ECF No. 53; Pls.' Opp'n to Motion to Strike ("Pls.' Class Cert. Strike Opp'n"), ECF No. 68; Def.'s Reply in Support of Class Cert. Strike Mot. ("Def.'s Class. Cert. Strike Reply"), ECF No. 73; and (3) plaintiffs' motion for sanctions stemming from defendant's since-denied motion to disqualify plaintiffs' counsel from both consolidated cases, accompanied by threats to file the same disqualification motion in over fifteen other cases in this and other courts brought by plaintiffs' counsel against defendant, Pls.' Mot. for Sanctions ("Pls.' Sanctions Mot."), ECF No. 74; Def.'s Opp'n to Sanctions ("Def.'s Sanctions Opp'n"), ECF No. 75; Pl.'s Reply in Support of Sanctions ("Pls.' Sanctions Reply"), ECF No. 76; *see* Hr'g Tr. (Feb. 24, 2026) ("Feb. 24 Hr'g Tr.") at 29:13-19, ECF No. 72 (denying motion to disqualify counsel "with opinion to follow"). All seven motions are now ripe for resolution.

For the reasons explained below, defendant's motion to dismiss *Merritt* is DENIED; defendant's motion to dismiss *Chang* is GRANTED IN PART as to Counts I, IV, and V, and DENIED IN PART as to Counts II and III; plaintiffs' motion for partial summary judgment as to Count I of *Chang* is DENIED; plaintiffs' motion for class certification is DENIED, without prejudice, as premature; defendant's motions to strike exhibits from plaintiffs' motions for partial summary judgment and motion for class certification are DENIED AS MOOT; and plaintiffs' motion for sanctions is GRANTED.

## I.    BACKGROUND

The factual background and procedural history are summarized next. For the purposes of resolving defendant's motions to dismiss each of the two cases, facts are drawn from plaintiffs'

Complaints and, where corroborated, by the defendant's admissions in response to plaintiffs' partial summary judgment motion.

### A.    Factual Background

Defendant is a "licensed security agency" in Washington, D.C.  *Chang* TAC ¶ 15; *Merritt* Am. Compl. ¶ 34; *see also* Pls.' Statement of Undisputed Facts in Support of *Chang* MPSJ ("Pls.' *Chang* SMF") ¶ 1, ECF No. 42-1; Def.'s Resp. to Pls.' Statement of Undisputed Facts ("Def.'s *Chang* SMF") ¶ 1, ECF No. 50-1.

The *Chang* plaintiffs, Brandon Chang and Anya Forrest, are defendant's current employees, *see Chang* TAC ¶¶ 25, 34, with Chang so employed since September 1, 2015, *id*. ¶ 25; Def.'s *Chang* SMF ¶ 15.  Chang has, "[s]ince at least August 2021," been assigned to the Al Jazeera building," with responsibility for "monitoring everyone who enters the building (including employees and guests), performing identification checks, conducting patrols, responding to emergencies, alarms, propped doors, and trespassers, and enforcing security policies to ensure the safety of tenants and visitors." *Chang* TAC ¶ 26.  For over five years, between July 15, 2014, and April 30, 2020, and again for two years, between December 11, 2023, and December 11, 2025, Chang held a security officer certification issued by the government of the District of Columbia, pursuant to 17 D.C. Municipal Regulation § 2199.1, though he did not hold this certification from May 1, 2020 to December 10, 2023, or after December 11, 2025.  *Id.* ¶¶ 29-31.[2]  As of January 2026, he was "in the process of renewing his license."  *Id.* ¶ 31.  Plaintiffs allege that "[s]ince at least July 1, 2019, defendant has at times paid Chang less than the minimum wage and overtime rates prescribed by the D.C. Minimum Wage Act [("DCMWA")], D.C. Code § 32-1001 *et seq.*"

---

[2]    17 D.C. Municipal Regulation § 2199.1 defines "[c]ertification," as referenced throughout the chapter, as "[t]he permission that must be granted by the Mayor before a person can lawfully be employed as a security officer in the District of Columbia."

for security officers, *id.* ¶ 32, even though Chang was entitled to those minimum rates because he was "employed to do" one or more of the duties listed in 17 D.C. Municipal Regulations § 2100 as those associated with a "security officer" (hereinafter "security officer duties"), *id.* ¶¶ 81, 89.

The second *Chang* plaintiff, Anya Forrest, has worked for defendant since June 2018, also at the Al Jazeera building and other buildings in the District of Columbia, *id.* ¶ 34, where her tasks included "ensur[ing] the protection of the site," "staying on patrol," "monitoring surveillance equipment," and "guarding entry points," among other tasks, *id.* ¶ 40. For over two years, between January 30, 2018, and April 30, 2020, and again for the last three years, from May 22, 2023, to the present, Forrest has held a security officer certification, but did not hold such a certification for the three-year period from May 1, 2020, to May 21, 2023. *Id.* ¶¶ 35-37. Like Chang, Forrest alleges that, since July 1, 2019, she was paid "less than the minimum wage and overtime rates prescribed by the [DCMWA]," *id.* ¶ 42, when she was entitled to those minimum rates because she, too, was "employed to do" security officer duties, *id.* ¶¶ 96, 102.

The two *Chang* plaintiffs assert claims for alleged underpayment for periods during which they did and did not hold security officer certifications, while, in contrast, their class allegations cover defendant's employees who, since July 1, 2019, were employed to perform security officer duties and paid less than the statutory minimum wage for security officers, only for periods during which class members did *not* hold security officer certifications. *Id.* ¶¶ 106-112 (Count V).

Regina Merritt, the sole named plaintiff in *Merritt*, has been defendant's employee "since approximately May 16, 2022 through the present," during which time she has worked "at multiple commercial properties," where she "monitor[s] everyone who enters the building, including employees and guests, respond[s] to emergencies, and enforc[es] security policies to ensure the safety of tenants and visitors." *Merritt* FAC ¶¶ 19, 22. "At all relevant times, [Merritt] has held a

security officer license." *Id.* ¶ 21.  She alleges that though employed to perform security officer duties, she was paid less than the minimum wage and overtime for a security officer under the DCMWA.  *Id.* ¶ 28.  In addition to her own claims, Merritt brings class allegations on behalf of defendant's employees who, since July 1, 2019, were employed to perform security officer duties for periods during which they *did* hold security officer certifications.  *Id.* ¶ 121.

Together, the *Merritt* and *Chang* class allegations cover all defendant's employees employed, since July 1, 2019, to perform security officer duties and paid less than the statutory minimum wage for security officers under the DCMWA, regardless of whether they held a security officer certification at the time.

### B.      Procedural History

*Chang* was filed in August 2024, initially asserting two claims under the DCMWA and DCWPCL, respectively, and seeking class certification. Compl., ECF No. 1.   Plaintiffs subsequently filed an amended complaint as of right, removing the DCMWA claim and leaving only the DCWPCL claim.  *Chang* First Am. Compl., ECF No. 12.[3]  In response, defendant moved to dismiss or, alternatively, to compel arbitration, Def.'s *Chang* First Mot. to Dismiss, or in the Alternative, to Stay, ECF No. 14, which defense motion was met by plaintiffs' second motion to amend their complaint, removing vestiges in the complaint referring to the DCMWA, Pls.' *Chang* Mot. for Leave to File Second Am. Compl., ECF No. 16.  Over defendant's objection, plaintiff was permitted to file a second amended complaint.  *See* Minute Order (Dec. 4, 2024) (granting plaintiffs' motion).  Without opposition from plaintiffs, defendant once again moved to compel

---

[3]      In response to the initial complaint, defendant moved to compel arbitration, pursuant to an arbitration agreement between the parties, Def.'s *Chang* First Mot. to Compel Arbitration, ECF No. 5; Def.'s *Chang* Suppl. Mem. in Support of Mot. to Compel Arbitration at 3, ECF No. 6, which motion was rendered moot by plaintiffs' filing of the first amended complaint.

arbitration and, meanwhile, stay the case, which motion was granted. Minute Order (Dec. 19, 2024). Almost one year later, the parties reported that, an arbitrator concluded that plaintiffs' claims were not subject to arbitration. *Chang* Jt. Status Report ¶ 3 (Nov. 7, 2025), ECF No. 33.[4]

*Merritt* proceeded along a similar path to *Chang*. *Merritt* was filed in November 2024 in D.C. Superior Court claiming, in a single count, that defendant violated the DCWPCL, without any class allegations. *See* Compl., *Merritt* ECF No. 1-1. This case was thereafter removed by defendant to this Court, Def.'s *Merritt* Not. of Removal, *Merritt* ECF No. 1, and defendant, again, sought to compel arbitration and stay the case, *see* Def.'s *Merritt* Mot. to Compel Arbitration & Stay, *Merritt* ECF No. 5. With plaintiff's consent, *see Merritt* Jt. Status Report (Jan. 16, 2025), *Merritt* ECF No. 15, the case was stayed pending arbitration, *se*e Minute Order (Jan. 17, 2025). Over eight months later, the parties reported that the arbitrator had concluded Merritt's claim was not subject to arbitration. *Merritt* Jt. Status Report (Sept. 30, 2025) ¶ 1, *Merritt* ECF No. 23. With the stay of the case lifted, Minute Order (Oct. 6, 2025), Merritt moved for leave to file an amended complaint to add the class allegations covering defendant's employees performing security officer duties and paid less than the security officer minimum wage, for periods during which they held security officer certifications. *Merritt* FAC ¶ 121. Defendant now moves to dismiss that operative first amended complaint in *Merritt*. Def.'s *Merritt* MTD.

---

[4]    While *Chang* was still in arbitration, the *Chang* plaintiffs filed, in D.C. Superior Court, a case claiming that defendant improperly disclosed, on the instant case's docket, confidential information about the arbitration, namely that the arbitrator made an initial determination that the dispute was arbitrable, and seeking relief in the form of a declaratory judgment that defendant abrogated the arbitration agreement, thereby releasing plaintiffs from any arbitration obligations. Complaint, *Chang v. United Am. Sec., LLC*, No. 25-cv-2696 (D.C. Super. Ct. filed July 24, 2025), ECF No. 1-1 at 2. This case was removed by defendant to this Court, *see Chang*, No. 25-cv-2696 (D.D.C. removed Aug. 15, 2025), and, after full briefing on plaintiffs' motion to remand filed in October 2025, *see* Pls.' Mot. to Remand *Chang*, No. 25-cv-2696, *Chang*, No. 24-cv-2377 ECF No. 30; Def.'s Resp. to Pls.' Mot. to Remand, *Chang*, No. 24-cv-2377 ECF No. 31; Pls.' Reply in Support of Mot. to Remand, *Chang*, No. 24-cv-2377 ECF No. 32, this case was subsequently remanded back to Superior Court, *see* Minute Order (Nov. 20, 2025), *Chang*, No. 25-cv-2696. Plaintiffs voluntarily dismissed this case in Superior Court on February 19, 2026. *See* Notice to Ct., *Chang v. United Am. Sec.*, No. 2025-CAB-004822 (D.C. Sup. Ct. filed Feb. 19, 2026).

With consent of the parties, *Chang* and *Merritt* were consolidated in December 2025, with defendant's motion to dismiss *Merritt* pending.  Minute Order (Dec. 10, 2025).  The remainder of the briefing for defendant's motion to dismiss *Merritt* was filed on the consolidated *Chang* docket. *See* Pl.'s *Merritt* MTD Opp'n; Def.'s *Merritt* MTD Reply.

In January 2025, the *Chang* plaintiffs filed the operative third amended complaint that reorganized their *Chang* claims into five counts, all of which allege violations of the DCWPCL for failure to pay wages in a timely fashion, in periods during which Chang and Forrest did not hold security officer certifications, in Counts I and IV, respectively; in periods during which Chang and Forrest did hold security officer certifications, in Counts II and III, respectively; and on behalf of the class of defendant's employees who were employed to perform security officer duties and were not paid the security officer minimum wage, only for the periods in which they did not hold security officer certifications, in Count V.  *See generally Chang* TAC.  Subsequently, the *Chang* plaintiffs filed a motion for partial summary judgment, seeking determination of liability as to Count I, which covers only plaintiff Chang for periods during which he did not hold a security officer certification.  Pls.' *Chang* MPSJ.  In addition to opposing this motion, defendant moved to strike six of the exhibits attached to plaintiffs' motion for partial summary judgment.  Def.'s *Chang* MPSJ Opp'n; Def.'s *Chang* MPSJ Strike Mot.  Simultaneously, defendant moved to dismiss the third amended complaint in *Chang* for failure to state a claim.  Def.'s *Chang* MTD.

After defendant urged expedient resolution of the question of class certification, *see* Jt. Status Report (Dec. 23, 2025) ¶¶ 6-7, ECF No. 39, plaintiffs in both cases jointly filed a motion for class certification, Pls.' Class Cert. Mot, seeking certification of a class covering any of defendant's employees who, since July 1, 2019, worked as security officers but were paid less than the security officer minimum wage, whether or not they held security officer certifications—in

other words, a combined class of the *Chang* and *Merritt* putative classes. *Id.* at 4. Failing that, plaintiffs seek certification of the *Merritt* putative class, which covers only employees who held security officer certifications. *Id.* Defendant opposes certification of either class and also seeks to strike five exhibits from plaintiffs' class certification motion. Def.'s Class Cert. Opp'n; Def.'s Class Cert. Strike Mot.

While briefing on these pending motions was underway, defendant moved to disqualify plaintiffs' counsel, Justin Zelikovitz, Jonathan Tucker, and their firm DCWageLaw, in both cases. Def.'s Mot. to Disqualify Counsel ("Def.'s DQ Mot."), ECF No. 57. In opposing that motion, plaintiffs also sought to quash eighteen subpoenas served by defendant on plaintiffs and other putative class members late on the evening of February 16, 2026, the same day defendant filed the disqualification motion. Pls.' Emergency Request for Hearing, Opp'n of Def.'s Mot. to Disqualify, and Mot. to Quash Deposit. Nots. ("Pls.' Quash Mot."), ECF No. 60. In the face of this explosion of motion and discovery practice, the Court stayed defendant's deposition notices and any other discovery and scheduled an emergency hearing on the disqualification motion, as plaintiffs' counsel had requested. Minute Order (Feb. 19, 2026); *see also* Pls.' Quash Mot. at 3 ("[Defendant's] unfounded accusations demand prompt resolution. They create a cloud over ongoing and prospective client representations and, if left unresolved, threaten to deprive Plaintiffs of their chosen advocate and to ensure that the claims of hundreds of low-wage workers are never heard on their merits.").

At this hearing, which extended over two different dates and was conducted during the recesses in an ongoing criminal jury trial underway before the Court, s*ee* Minute Entry (Feb. 23, 2026); Minute Entry (Feb. 24, 2026), defendant, after initially declining the Court's invitation to to withdraw its motion to disqualify plaintiffs' counsel, Hr'g Tr. (Feb. 23, 2026) ("Feb. 23 Hr'g

9

Tr.") at 15:17-21, 16:11-16, did finally so move after the emergency hearing had commenced, *id.* at 18:9-10. This motion to withdraw was denied because "the damage ha[d] been done," given the Court's finding that the disqualification motion had been filed "for tactical reasons," "to impugn the plaintiffs' firm's integrity and ethics," and "to chill their communications that might be appropriate with employees of defendant." Feb. 24. Hr'g Tr. at 2:20-23, 3:5. Defendant's disqualification motion was also denied on the merits. *Id.* at 29:13-14. Plaintiffs indicated they would seek sanctions for the filing of the disqualification motion, in the form of attorneys' fees expended responding to the motion, Feb. 24 Hr'g Tr. 3:6-13, and subsequently filed their motion for sanctions, Pls.' Sanctions Mot., which is now ripe for resolution.[5]

## II.    APPLICABLE LEGAL STANDARDS

### A.    Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When considering a Rule 12(b)(6) motion, a court must "accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable inferences in the [plaintiff's] favor." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). A court may also consider "any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *Hurd*

---

[5]    Further facts regarding these disqualification proceedings, along with the legal standards governing plaintiffs' sanctions motion, are discussed *infra* in Part III.D. Defense counsel, Adam Calandra, Teresa Jakubowski, and their law firm Barnes & Thornburg, are represented in litigation over the sanctions motion by counsel from Wiley Rein LLP. *See* Def.'s Sanctions Opp'n.

*v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (citation and alteration omitted). Factual disputes, however, generally cannot be resolved on a motion to dismiss, as a court's "role is not to speculate about which factual allegations are likely to be proved after discovery." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015).

### B. Motion for Summary Judgment

Summary judgment may be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the non-moving party must point to "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). Both the movant and nonmovant must support their respective positions by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A), (B). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (internal quotation marks omitted).

11

While the court must provide the nonmovant the benefit of all reasonable inferences from the record, *see Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23-24 (D.C. Cir. 2013), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" their position; instead, "there must be evidence on which the jury could reasonably find" for the nonmoving party, *Liberty Lobby*, 477 U.S. at 252.  Thus, conclusory assertions without support from the record cannot create a genuine dispute of material fact.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009).  Indeed, a moving party may succeed on a summary judgment motion by pointing to "an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

## III.    DISCUSSION

The parties' motions raise several legal issues.  First, defendant moves to dismiss the claims in both *Chang* and *Merritt* for failure to state a claim on the ground that the complaints "bring claims under the D.C. Wage Payment and Collection Law . . . that are entirely derivative of alleged violations of the D.C. Minimum Wage Act" and "fail[] to assert any independent cause of action under the DCMWA."  Def.'s *Chang* MTD at 1; Def.'s *Merritt* MTD at 1.  As described in more detail, *infra* in Part III.A, plaintiffs bring claims only under DCWPCL, which requires, *inter alia*, that employers pay employees "all wages earned . . . on regular paydays designated in advance by the employer and at least twice during each calendar month," D.C. Code § 32-1302, but the determination of what wages plaintiffs were owed hinges on a different provision of D.C. law, the DCMWA.

Second, defendant seeks dismissal of *Chang* for failure to state a claim insofar as the *Chang* plaintiffs seek damages for periods during which plaintiffs had no security officer certification from the government of the District of Columbia, which lack of certification defendant contends

precludes application of the DCMWA "security officer" minimum wage (the "certification issue"). Def.'s *Chang* MTD at 1-2.

Third, the *Chang* plaintiffs seek summary judgment as to Count I of their Third Amended Complaint, which claim pertains only to plaintiff Chang when he lacked a security officer certification. *Chang* TAC ¶¶ 79-85. Defendant opposes grant of partial summary judgment on both legal and factual grounds, contending (1) that without a security officer certification, Chang was not eligible for the "security officer" minimum wage set out in DCMWA, Def.'s *Chang* MPSJ Opp'n at 13; (2) that the DCWPCL claim cannot stand alone without an underlying DCMWA claim, *id.* at 18; and (3) that plaintiffs' factual characterizations of Chang's job duties, which bear on whether Chang was a "security officer" under the DCMWA, are contested, *see* Def.'s *Chang* SMF.[6] In deciding plaintiffs' motion for partial summary judgment, defendant urges that its motion to strike certain exhibits attached to plaintiffs' motion for partial summary judgment must be considered, *see* Def.'s *Chang* MPSJ Strike Mot., as well as defendant's request for discovery prior to summary judgment, pursuant to Federal Rule of Civil Procedure 56(d), *see* FED. R. CIV. P. 56(d) Decl. of Adam Calandra, Def.'s Counsel, ECF No. 50-2.

---

[6] The *Chang* plaintiffs initially indicated that they intended to seek summary judgment only on the discrete legal issue whether security officer certification was a prerequisite to the security officer minimum wage, but ultimately filed their summary judgment motion seeking summary judgment as to liability on Count I, Jt. Status Report (Dec. 23, 2025) ¶ 2, ECF No. 39, even though the certification issue is only one of the showings plaintiffs must make to prevail on this claim. Defendant objected that broadening the scope of the summary judgment motion exceeded plaintiffs' initial representations about their anticipated motion, and focused its opposition only on the certification issue. Def.'s *Chang* MPSJ Opp'n at 10 ("GardaWorld submits this Response under the assumption that Plaintiff seeks only summary judgment as to the *legal issue* of whether or not a security officer license is a prerequisite to any entitlement of the heightened minimum wages afforded to the profession under the DCMWA." (emphasis in original)). Plaintiffs correctly noted in reply that they are entitled to seek summary judgment—of any scope—while also noting that "[t]he Court of course retains full discretion to address only the threshold certification question if it prefers, and Plaintiff would welcome that ruling." Pls.' *Chang* MTD Opp'n at 12-13. In any case, plaintiffs' motion for partial summary judgment is denied based on the discrete legal issue of whether security officer certification is a prerequisite for application of the security officer minimum wage, so defendant's concerns about the scope of plaintiffs' motion are of no consequence.

Fourth, plaintiffs in both cases seek class certification, defining two potential classes, which they call the "Class" and the "*Merritt* class." Pls.' Class Cert. Mot. at 4. Plaintiffs' preferred outcome is certification of the "Class," which consists of defendant's employees who, since July 1, 2019, "were employed to perform one or more of the duties enumerated" in the D.C. Municipal Regulations' definition of "security officer," and "who were paid less than the wage and fringe-benefit rate required by D.C. Code § 32-1003(h), regardless of whether they held an active District of Columbia security-officer certification during the relevant period," thereby combining the class allegations from *Merritt* and *Chang*. *Id.* at 4. Certification of that class "depend[s] on the Court's resolution of" the question whether possession of a security officer certification is a prerequisite to be eligible for the "security officer" minimum wage. *Id.* If that question is answered affirmatively, plaintiffs seek, in the alternative, certification of the *Merritt* class, which includes defendant's employees who, since July 1, 2019, "were employed to perform one or more of the duties enumerated" in the D.C. Municipal Regulations' definition of "security officer," and who "were paid less than the wage and fringe-benefit rate required by D.C. Code § 32-1003(h)" "during periods in which they held an active District of Columbia security-officer certification." *Id.* In short, if plaintiffs prevail on the security officer certification issue, they seek certification of a broad class of employees employed by defendant to perform certain enumerated security officer duties, whereas, if they do not prevail on the certification issue, they alternatively seek certification of a narrower class of those employees who performed security officer duties *and* held certifications. Defendant opposes certification of either class primarily on the basis that "the question central to the resolution of Plaintiffs' claims—whether they qualify as 'security officers' pursuant to the DCMWA—is not a common issue," since different plaintiffs may have had different job duties. Def.'s Class Cert. Opp'n at 1. Defendant also claims that plaintiffs' counsel

14

is inadequate as class counsel, *id.* at 2, objects to certification of a class before any class discovery, *id.* at 18, and further seeks to strike certain exhibits attached to plaintiffs' class certification motion, Def.'s Class Cert. Strike Mot.

Finally, plaintiffs seek sanctions for defendant's filing of a motion to disqualify plaintiffs' counsel and surrounding conduct, and request that defendant reimburse plaintiffs for attorneys' fees and costs associated with responding to defendant's motion. Pls. Sanctions Mot.

As explained in detail below, plaintiffs' DCWCPL claim may stand alone without an associated DCMWA claim, so no dismissal of the operative complaints is warranted on that basis. Defendant is correct, however, that security officer certification is a prerequisite for applicability of the security officer minimum wage, so the *Chang* claims, in Counts I, IV, and V, based only on "uncertified periods" of employment are dismissed, and plaintiffs' motion for summary judgment as to Count I in *Chang* is denied, rendering defendant's motions to strike exhibits from consideration of plaintiffs' summary judgment motion and for discovery moot and therefore also denied. Since both parties agree that a decision on class certification would be premature at this juncture, prior to any discovery, plaintiffs' class certification is denied without prejudice to refile, and defendant's strike motion is also denied as moot. Finally, plaintiffs' motion for sanctions is granted in full.

### A. Plaintiffs' DCWPCL Claims Are Viable Without a DCMWA Claim

Defendant contends that plaintiffs fail to state a claim in both *Merritt* and *Chang* because their DCMWA claims "are entirely derivative of alleged violations of the D.C. Minimum Wage Act." Def.'s *Chang* MTD at 1; *see also* Def.'s *Merritt* MTD at 1. Defendant asserts that plaintiffs omitted DCMWA claims from their complaints because parties have an arbitration agreement that mandates arbitration for DCMWA claims. *See* Def.'s Opp'n to Pls.' Mot. for Leave to Amend

Compl. at 2, ECF No. 18.  In defendant's reasoning, since plaintiffs' DCWPCL claim of untimely wages will only succeed if plaintiffs show that they were entitled to the "security officer" minimum wage set by the DCMWA, plaintiffs must bring a DCMWA claim to accompany their DCWPCL claim.  Def.'s *Chang* MTD at 1; Def.'s *Merritt* MTD at 1.  This reasoning is neither mandated nor even supported by the two statutes at issue.  As a Judge of the D.C. Superior Court recently persuasively explained in denying this same defendant's motion to dismiss that was predicated on the same grounds presented here in another case alleging similar facts, "[t]he DCWPCL explicitly provides a remedy for unpaid minimum wages, and the heightened minimum wage owed to security officers is a statutory minimum wage," and "[m]erely because Plaintiff may also have a cognizable DCMWA claim is not a sufficient basis to dismiss a properly pled DCWPCL claim." *Rivas v. United Am. Sec.*, No. 2025-CAB-1089, slip op. at 11 (D.C. Super. Ct. Apr. 21, 2026).

Beginning with the text of the statutes, the DCMWA obliges employers to pay a minimum wage and the DCWPCL further obliges employers to make timely payment of wages due to employees.  Specifically, the DCMWA requires, *inter alia*, that "an employer shall pay a security officer working in an office building in the District of Columbia wages, or any combination of wages and benefits, that are not less than" an amount set out in a specified U.S. Department of Labor regulation.  D.C. Code § 32-1003(h).  The DCWPCL, in turn, requires employers to "pay all wages earned" to their "employees on regular paydays," *id.* § 32-1302, and defines "wages" as "all monetary compensation . . . owed by an employer," clarifying expressly that "[t]he term 'wages' includes . . . [o]ther remuneration promised or owed . . . [p]ursuant to District or federal law," *id.* § 32-1301(3).  Plaintiffs in each case squarely allege that defendant failed to make timely payment to them of "all wages earned" by not paying them "remuneration promised or owed . . .

16

[p]ursuant to District . . . law," *i.e.*, the DCMWA.  *Id.* § 32-1301(3); *see Chang* TAC ¶ 2; *Merritt* FAC ¶ 1.  These allegations plainly state a claim under the DCWPCL.[7]

This conclusion comports with how the DCWPCL has been routinely applied in this Court.  DCWPCL's "broad language governs not only the timing of wage payments, but also the amount of wages that must be paid."  *Wilson v. On the Rise Enters., LLC*, 305 F. Supp. 3d 5, 16 (D.D.C. 2018) (Howell, C.J.); *see also Akinsinde v. Not-for-Profit Hospital Corp.*, 216 F. Supp. 3d 33, 43 (D.D.C. 2016) (Mehta, J.) (holding that, where "the crux of Plaintiff's claim is that she routinely was not paid for the break-time hours that she worked . . . , she sufficiently pleaded a violation of DCWPCL").[8]  "After all, an employer fails to pay 'all wages earned,' by failing to pay either by the required date or the full amount due."  *Wilson*, 305 F. Supp. 3d at 16 (citation omitted) (quoting

---

[7]    In a footnote, defendant attempts to relitigate the arbitrator's arbitrability decision, arguing that "interpreting the DCWPCL to categorically foreclose arbitration of wage claims would conflict with the Federal Arbitration Act and be subject to federal preemption."  Def.'s *Chang* MTD at 2 n.1.  This argument amounts to a proverbial red herring since plaintiffs never contend that the DCWPCL categorically forecloses arbitration of anything.  Instead, the parties voluntarily exempted from their arbitration agreement "claims under the [DCWPCL]."  Order of Dismissal at 2, JAMS Arbitration No. 5410000961, *Chang v. United American Security, LLC*, No. 25-cv-2696 (BAH), ECF No. 16-1 (quoting the arbitration agreement and finding that plaintiffs' claims in the instant case are not subject to arbitration because they arise under the DCWPCL); *see also* Def.'s Mem. in Supp. of Mot. to Dismiss or Compel Arbit. at 2, ECF No. 15 ("[Plaintiffs'] arbitration agreements provide for a carve-out for claims brought solely under the DCWPCL.").  While "the FAA 'preempts any state rule discriminating on its face against arbitration—for example, a law prohibit[ing] outright the arbitration of a particular type of claim,'" *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 650 (2022) (alteration in original) (quoting *Kindred Nursing Ctrs. Ltd. Partnership v. Clark*, 581 U.S. 246, 251 (2017)), the only thing removing this case from arbitration is the parties' arbitration agreement itself.  Defendant implies that the parties' contractual "carve-out" may be obligatory, since "the DCWPCL provides that its protections may not be 'set aside by private agreement,'" Def.'s *Chang* MTD at 2 n.1 (quoting D.C. Code § 32-1305), but points to no indications that this DCWPCL provision prohibits arbitration agreements covering DCWPCL claims.  In sum, defendant signed an arbitration agreement that did not cover the DCWPCL claims at issue here and this fact, rather than any legal preemption doctrine, is the basis for the arbitrability decision.

[8]    Notably, defendant failed in its *Merritt* opening briefing in support of its motion to dismiss to cite to *Wilson v. On the Rise Enters., LLC*, 305 F. Supp. 3d 5 (D.D.C. 2018) (Howell, C. J.); and *Akinsinde v. Not-for-Profit Hospital Corp.*, 216 F. Supp. 3d 33 (D.D.C. 2016) (Mehta, J.), leaving the heavy lift of research to plaintiffs to bring these on-point cases forward for consideration.  After acknowledging and responding to these adverse authorities in its reply brief in support of the *Merritt* motion to dismiss, filed in December 2025, *see* Def.'s *Merritt* MTD Reply at 4, defendant nonetheless again failed to address these cases or bring them to the Court's attention in its motion to dismiss *Chang*, filed two months later in February 2026, *see generally* Def.'s *Chang* MTD.  The former calls into question defense counsel's research capabilities; the latter its adherence to D.C. ethics rules.  *See* D.C. Rule of Professional Conduct 3.3(a)(3) ("A lawyer shall not knowingly . . . [f]ail to disclose to the tribunal legal authority in the controlling jurisdiction not disclosed by opposing counsel and known to the lawyer to be dispositive of a question at issue and directly adverse to the position of the client.").

D.C. Code § 32-1302).    Moreover, the DCWPCL is routinely found to provide an independent cause of action, with the interpretation urged by defendant here, that "the DCMWA provides the exclusive remedy for unpaid overtime wages under D.C. law," "squarely foreclosed" by the text of the DCWPCL.    *Covington v. FMC & Assocs., LLC*, No. 22-cv-01441 (RDM), 2023 WL 5133184, at *5 (D.D.C. Aug. 10, 2023).    Indeed, the DCWPCL expressly provides that an employee "aggrieved by a violation of the [DCWPCL] . . . *or*" the DCMWA may bring "a civil action" against their employer.    D.C. Code § 32-1308(a)(1)(A) (emphasis added); *see also Gwapadinga v. Fescum Inc.*, 636 F. Supp. 3d 71, 75 (D.D.C. 2022) ("Both statutes provide underpaid employees with a civil cause of action.").    Thus, "whether a claim under the [DCMWA] also might lie against the defendants simply has no bearing on whether the plaintiff has a claim under the [DCWPCL]."    *Wilson*, 305 F. Supp. 3d at 17.

Consequently, plaintiffs are not required to prevail on a claim under the controlling minimum wage law in order to sustain a DCWPCL claim.    For instance, in *Akinsinde*, the District Court dismissed plaintiff's Fair Labor Standards Act ("FLSA") and DCMWA claims for failure to state a claim, since the employer had not violated the overtime provisions of those statutes cited by plaintiff, but nonetheless found that her DCWPCL claim survived dismissal since she adequately alleged that she was not paid for designated break times when she worked.    *Akinsinde*, 216 F. Supp. 3d at 41-43.    In sum, the DCMWA and DCWPCL provide two separate but overlapping causes of action, and plaintiffs' failure to plead a DCMWA claim is irrelevant to the legal sufficiency of their DCWPCL claims.

Defendant, seemingly conceding that *some* claims under the DCWPCL would be cognizable without plaintiff bringing a separate claim under the law entitling them to a particular minimum wage, attempts to differentiate between "clearly owed wages under a fixed minimum

18

wage or a contractual agreement," and the instant case where the amount of wages owed is disputed, contending that in the latter circumstance a DCWPCL claim must rest on a successful DCMWA claim. Def.'s *Merritt* MTD at 6. Not so. This distinction is simply not supported by the statutory text. Instead, the DCWPCL clearly contemplates application of this statute even "[i]n the case of a bona fide dispute concerning the amount of wages due," D.C. Code § 32-1304, in which circumstance, if the employer pays only the amount the employer concedes is due, "[t]he employee . . . shall be able to pursue any such balance of unpaid wages and related damages, interest, costs, and penalties," *id.*; *see also Wilson*, 305 F. Supp. 3d at 12, 16 n.8 (rejecting the argument that, under the DCWPCL "when there is a dispute over the amount owed, the employer [must] pay the undisputed amount" only (internal quotation marks omitted)). In short, the fact that defendant believes the amount of wages owed was less than "clear[]," Def.'s *Merritt* MTD at 6, has no bearing on plaintiffs' DCWPCL claim.

In sum, plaintiffs' DCWPCL claims in both *Chang* and *Merritt* are viable challenges to defendant's alleged nonpayment of wages even without a DCMWA claim, and therefore defendant's motions to dismiss predicated solely on this argument in *Merritt*, and as to Counts II and III in *Chang*, are denied.

## B. Security Officer Certification Required for Security Officer Minimum Wage

Defendant seeks dismissal of *Chang's* Counts I, IV, and V, which are limited to "uncertified periods" when plaintiffs did not have security officer licenses issued by the District of Columbia, contending that entitlement to the security officer minimum wage requires that the employee have a security officer certification. *See Chang* TAC ¶¶ 79-85, 100-112. This Court agrees that D.C. law requires an individual to hold security officer certification to qualify for the security officer

minimum wage, which is the same conclusion reached by two other Judges of this Court and a Judge of the D.C. Superior Court.

This analysis, again, starts with the statutory text. The D.C. Code provides for a minimum wage, in an amount set by reference to a federal regulation, for "security officer[s]." D.C. Code § 32-1003(h). "'[S]ecurity officer' shall have the same meaning as provided in section 2100 of Title 17 of the District of Columbia Municipal Regulations." *Id.* § 32-1002(7A). Section 2100.1 of Tile 17 of the D.C. Municipal Regulations, in turn, provides that "the term 'security officer' means any person privately employed to do any of the following: (a) Prevent the theft, misappropriation, or concealment of goods, wares, merchandise, money, bonds, stock certificates, or other valuable documents, papers, and articles; (b) Prevent damage to real or personal property; (c) Prevent assaults, gate-crashing, or other disorders at meetings, events, or performances; or (d) Prevent similar illegal occurrences." 17 D.C. Mun. Regs. § 2100.1. This cross-reference alone does not settle the issue, however, whether a security officer is anyone employed to perform at least one of the security officer duties, since the regulations go on to provide that a person may not "lawfully be employed as a security officer in the District of Columbia" without a security officer "certification" "granted by the Mayor." *Id.* § 2199.1. Obtaining such a certification requires a background investigation, *id.* § 2104-2105, specified training, *id.* § 2108, meeting certain health requirements, *id.* § 2103, and other prerequisites, *see, e.g.*, *id.* § 2106.

Assuming that plaintiffs are correct that they were "employed to perform" some of the tasks listed in the definition of "security officer" in 17 D.C. Municipal Regulations § 2100.1, such employment was not "lawful" during the periods they did not hold security officer certifications.[9]

---

[9] The District's municipal regulations provide consequences for both individuals who work in security officer positions without a license, and for security agencies that fail to ensure their security officer employees are appropriately certified. *See* 17 D.C. Mun. Regs. § 2100.6 ("[V]iolation of any provision of this chapter shall be punishable by a fine of up to three hundred dollars ($300) or by imprisonment for up to ninety (90) days, in addition

A person who is not lawfully permitted to work as a security officer cannot be entitled to the security officer minimum wage. *See Williams v. United Am. Sec., LLC*, 788 F. Supp. 3d 40, 45 (D.D.C. 2025) ("It simply cannot be the case that an individual not yet certified to perform the duties of a 'security officer' (at least under District of Columbia law) would be entitled to the wages attending that regulated profession."); *Rivas v. United Am. Sec., LLC*, No. 23-cv-3748 (SLS), 2026 WL 482531 (D.D.C. Feb. 20, 2026) (same); *Rivas*, No. 2025-CAB-1089, slip op. at 4-7. As another Judge of this Court explained, the D.C. Enhanced Professional Security Amendment Act of 2006, D.C. Law 16-187 "created minimum training standards for security officers," ensured via a security officer certification regime, "with the ultimate goal of improving public safety." *Williams*, 788 F. Supp. 3d at 45 (citing D.C. COMM. REP., B. 17-199 (Nov. 13, 2007)). The law, however, "quickly encountered a roadblock to achieving its goal: high turnover among security officers," to which the D.C. Council responded by amending the DCMWA "to establish the higher wages" for security officers, *id.* Thus, the heightened minimum wage in the DCMWA is intended to bolster the primary purpose of the Enhanced Professional Security Amendment Act—to ensure security officers are trained, certified, and regulated. Applying the minimum wage to uncertified persons employed to do security officer tasks directly undermines the law's goal. *See Rivas*, 2025-CAB-1089, slip op. at 6 ("The express legislative purpose of regulating the licensure of private security officers is to promote public health and safety. . . . The heightened wage for security officers was adopted in furtherance of that goal.").

---

to the possible denial, suspension, or revocation of certification under the provisions of this chapter."); *id.* §§ 2101, 2126 (allowing Mayor to "deny a security agency license to any individual or firm, reprimand any licensed security agency, fine any licensed security agency, or suspend or revoke a security agency's license" if agency fails to follow the provisions of the chapter, including "supervis[ing] security officers in their employ"). These regulations appear to pose liability risks to both plaintiffs and defendant by performing or having individuals perform security officer duties without the appropriate security officer license.

Accordingly, Counts I, IV, and V in *Chang* are dismissed, and the *Chang* plaintiffs' motion for partial summary judgment as to Count I is denied.[10]

## C. Class Certification Would Be Premature

Plaintiffs move for class certification, based on a briefing schedule issued on defendant's insistence that the issue of class certification should and could be resolved promptly so that other plaintiffs with similar cases pending before this Court and the D.C. Superior Court could know whether they would need to opt out or in of any potential class. *See* Jt. Status Report (Dec. 23, 2026) ¶¶ 6-7, ECF No. 39. Defendant has now back-tracked, however, arguing that this motion is "premature," Def.'s Class Cert. Opp'n at 1, and "object[ing] in the strongest manner possible to the potential certification of any class without formal discovery," *id.* at 8. Put another way, both parties believe that a decision on class certification before discovery would be premature, and that more conferral and discovery would be beneficial in determining what class, if any, should be certified, particularly with the issues narrowed by this Memorandum Opinion. The Court agrees. Therefore, plaintiffs' class certification motion is denied without prejudice as premature.[11]

---

[10]    Since plaintiffs' motion for partial summary judgment is denied without consideration of any attached exhibits, defendant's request for discovery need not be considered and defendant's motion to strike is denied as moot. For the most part, defendant's reasons for striking—that the exhibits are "inadmissible, prejudicial, . . . or otherwise immaterial to relief sought in Plaintiff's Motion," Def.'s *Chang* MPSJ Strike Mot. at 1—concern only whether the exhibits should be considered in deciding plaintiffs' motion for partial summary judgment, not whether the exhibits may be displayed on a public docket, and are therefore mooted by denial of plaintiffs' summary judgment motion. Defendant contends that one of these exhibits, Exhibit G, ECF No. 43-1, is subject to a protective order in *Rivas v. United American Security, LLC*, No. 23-cv-3748 (SLS) (D.D.C.), and objects to plaintiffs "rely[ing] on this confidential document to prompt the Court toward a premature liability determination," but raises no apparent issue with this document being posted on a public docket. Def.'s *Chang* MPSJ Strike Mot. at 7. Defendant also does not request sealing or other removal of this exhibit from the document. *See* Def.'s Proposed Order re: Mot. to Strike MPSJ Exs., ECF No. 48-2. Therefore, the motion to strike Exhibit G also appears to be moot.

[11]    For the same reasons that defendant's motion to strike certain exhibits attached to the *Chang* plaintiffs' motion for partial summary judgment is denied as moot, *see supra* n.10, defendant's motion to strike exhibits attached to plaintiffs' motion for class certification is denied as moot.

### D. Sanctions Are Warranted

Finally, plaintiffs seek sanctions against defense counsel, in the form of attorneys' fees associated with responding to defendant's motion to disqualify plaintiffs' counsel, which motion was denied orally at the emergency hearing held on February 24, 2026.  *See* Pls.' Sanctions Mot. at 22 (seeking monetary sanctions against "Teresa L. Jakubowski, Adam T. Calandra, and Barnes & Thornburg LLP, jointly and severally"); Minute Entry (Feb. 24, 2026); Feb. 24 Hr'g Tr. 29:13-14.  After review of the facts giving rise to plaintiffs' motion for sanctions, the Court concludes that defense counsel's actions "unreasonably and vexatiously" "multiplie[d] the proceedings" in these consolidated matters, warranting an order that defense counsel "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct," under 28 U.S.C. § 1927.[12]

### 1. Factual Background to Plaintiffs' Motion for Sanctions

Defense counsel notified plaintiffs' counsel of the intent to file the disqualification motion at 3:37 PM on Monday, February 16, 2026, two days before plaintiffs' reply in support of summary judgment was due, Pls.' Sanctions Mot. at 6, and then filed the motion at 11:49 PM that evening, *id.* at 7; Def.'s DQ Mot.  Defendant's motion advanced six grounds for disqualification: (1) alleged violations of D.C. Rule of Professional Conduct 4.2, which prohibits *ex parte* communications by lawyers with represented persons, for calling certain hourly employees of defendant to screen them as potential plaintiffs, Def.'s DQ Mot. at 6; (2) simultaneously representing individuals and class

---

[12]    Plaintiffs also invoke, as an alternative basis for their sanctions motion, the Court's "inherent power at common law," *Parsi v. Daioleslam*, 778 F.3d 116, 131 (D.C. Cir. 2015) (citing *Chambers v. NASCO*, 501 U.S. 32, 33 (1991)), under which courts may issue "fines, awards of attorneys' fees, and such other orders and sanctions as they find necessary" "to protect their institutional integrity and to guard against abuses of the judicial process," *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995).  For the same reasons that payment of attorneys' fees is appropriate under 28 U.S.C. § 1927, given the "clear and convincing evidence" that defense counsel acted in "bad faith" when filing its disqualification motion and in its actions thereafter, *see Parsi*, 778 F.3d at 131, the same sanctions against Jakubowski, Calandra, and Barnes & Thornburg would also be appropriate under the Court's inherent authority.

23

plaintiffs against the same defendant on similar claims, purportedly in violation of D.C. Rule of Professional Conduct 1.7, along with other alleged conflicts of interest, *id.* at 9-11; (3) alleged violations of D.C. Rule of Professional Conduct 4.4, which prohibits vexatious or harassing litigation, due to plaintiffs' counsel's representation of 18 employees suing defendant for similar claims, *id.* at 12; (4) alleged violations of D.C. Rule of Professional Conduct 3.3, which requires candor to the court, for filing an ancillary lawsuit to *Chang* seeking declaratory judgment that certain of defendant's actions in *Chang* violated parties' confidentiality agreement, *id.* at 13; *see also supra* n.4; (5) alleged violation of Rule 3.3 for filing "inadmissible evidence" in support of plaintiffs' motions for partial summary judgment and class certification, *id.* at 14; and (6) alleged violations of Rule 3.3 for representing to other Judges that certain other plaintiffs represented by plaintiffs' counsel would opt out of any class certified in the instant consolidated cases, *id.* at 15. Around the same time that night, defendant served eighteen deposition notices on plaintiffs in this case and on individuals who had submitted declarations in support of plaintiffs' motion to certify a class. Pls.' Quash Mot. at 26.

Two days later, at 10:10 AM on Wednesday, February 18, the day that plaintiffs' summary judgment reply was due, defense counsel, Adam T. Calandra, once again contacted plaintiffs' counsel, this time notifying the latter of defense counsel's intent to file similar disqualification motions in the 17 other wage-and-hour cases brought by plaintiffs' counsel against defendant that were pending in the District Court and the D.C. Superior Court. Pls.' Sanctions Mot., Ex. A, Email from Calandra to Justin Zelikovitz, Pls.' Counsel (Feb. 18, 2026, 10:10 AM), ECF No. 74-2 at 2. At 11:41 AM, plaintiffs' counsel responded, informing defense counsel that defendant's disqualification motion in the instant case "did not address" numerous authorities adverse to defendant's position and cautioning defense counsel not to file similar motions in order to avoid

violating defense counsel's ethical obligations to advise the Court of adverse authority. *Id.*, Email from Zelikovitz to Calandra (Feb. 18, 2026, 11:41 AM), ECF No. 74-2 at 3. Calandra responded at 5:43 PM: "You provided that your opposition [to the disqualification motion] identifies several on-point authorities that were not addressed in the Motion to Disqualify that we filed in the *Chang* matter. Please provide any binding authority from the D.C. Court of Appeals that you believe we have not addressed by 6:30 p.m. [*i.e.*, less than one hour later] for our review." *Id.*, Email from Calandra to Zelikovitz (Feb. 18, 2026, 5:43 PM), ECF No. 74-2 at 5. In response to defense counsel's one-hour deadline, plaintiffs' counsel highlighted that plaintiffs' summary judgment reply was due that same night, but promised that "[n]evertheless, we will get you something by 7," and once again reminded defense counsel that they "have an ethical duty to inform the court of adverse authority." *Id.*, Email from Zelikovitz to Calandra (Feb. 18, 2026, 5:49 PM). Thirty minutes later, plaintiffs' counsel sent defense counsel a draft of plaintiffs' opposition to defendant's motion to disqualify, which was filed on the docket later that night. *Id.*, Email from Zelikovitz to Calandra (Feb. 18, 2026, 6:18 PM), ECF No. 74-2 at 7. Plaintiffs' opposition to the disqualification motion incorporated a motion to quash the eighteen deposition notices served by defendant and requested an emergency hearing on both matters primarily on the basis that defendant's charges of unethical conduct by plaintiffs' counsel "are not the kind of allegations that should linger on the docket." Pls.' Quash Mot. at 3. A hearing was scheduled for Monday, February 23, 2026. Minute Order (Feb. 19, 2026).

After the hearing was scheduled, defense counsel contacted plaintiffs' counsel "in an effort to deescalate the situation—a 'reset' if you will at least as between counsel so [both parties' counsel] can focus on the merits of this matter." Pls.' Sanctions Mot., Ex. A, Email from Calandra to DCWageLaw (Feb. 20, 2026, 12:38 PM), ECF No. 74-2 at 11. Defense counsel offered to

"withdraw the pending request for disqualification" if plaintiffs' counsel agreed to seek defense counsel's permission before contacting defendant's employees and to exclude certain evidence already submitted by plaintiffs in support of plaintiffs' substantive motions. *Id.* Plaintiffs' counsel declined this offer. *Id.*, Email from Zelikovitz to Calandra (Feb. 20, 2026, 4:20 PM), ECF No. 74-2 at 13-14.

Due to an ongoing criminal jury trial before the Court, the emergency hearing in these two civil cases was conducted during recesses in the trial. Feb. 23. Hr'g Tr. at 3:22-23. The Court heard the parties initially for approximately 20 minutes in the morning and heard primarily from defense counsel Teresa L. Jakubowski on behalf of defendant. The Court inquired whether defendant conceded that they "should have met and conferred and tried to resolve some of these [issues] before raising them in a disqualification motion requiring an emergency hearing," and whether defendant had withdrawn or wished to withdraw any of the bases for disqualification, Feb. 23 Hr'g Tr. at 15:17-21, to which defendant responded they were not withdrawing any bases for disqualification, *id.* at 16:11-16. The hearing reconvened in the early afternoon, at which point Jakubowski announced that defendant was "going to withdraw [their] motion for disqualification." *Id.* at 18:9-10. The Court clarified that defendant could "make a motion to withdraw; [but] you just can't do it by yourself." *Id.* at 18:18-19. Plaintiffs' counsel explained that while their "whole firm is relieved that Gardaworld is withdrawing their six baseless allegations about ethical misconduct," defendant had "already achieved their objectives: [d]istraction, intimidation, driving up costs," and further that "you can't unring a bell," because "[w]hat [defendant] ha[d] said about [Zelikovitz], about the people [he] work[s] with and care[s] about, it now lives on in the public record for someone like Gardaworld to use in another proceeding just like this one." *Id.* at 29:6-10, 29:24-25:2.

26

The hearing reconvened the following day, again during a recess in the ongoing criminal jury trial, and the Court denied defendant's motion to withdraw its disqualification motion, "given the fact that the damage has been done; disqualification motion [was filed] for tactical reasons, and to impugn the plaintiffs' firm's integrity and ethics, and to chill their communications that might be appropriate with employees of defendant."  Feb. 24 Hr'g Tr. at 2:20-23.  After hearing from the parties on each asserted ground for disqualification, the Court denied defendant's motion to disqualify plaintiffs' counsel for the reasons articulated at the hearing and summarized next.  *Id.* at 29:13-19.

### 2.  Denial of Defendant's Disqualification Motion

As discussed at the hearing, none of the six grounds asserted by defendant justify disqualification of plaintiffs' counsel.

First, plaintiffs' counsel did not violate D.C. Rule of Professional Conduct 4.2 by calling hourly employees of defendant to inquire whether they would be interested in suing defendant for wage and hour violations.  *Cf.* Def.'s DQ Mot. at 6.  Rule 4.2 prohibits lawyers from "communicat[ing] about the subject of the representation with a person known to be represented by another lawyer in the matter," including "an employee of an organization, who has the authority to bind an organization as to the representation to which the communication relates."  D.C. Rule of Professional Conduct 4.2(a), (c).  The commentary to Rule 4.2 makes clear that the scope of this prohibition is limited and that "[t]he rule does not prohibit a lawyer from communicating with employees of an organization who have the authority to bind the organization with respect to the matters underlying the representation if they do not also have authority to make binding decisions regarding the representation itself."  *Id.* cmt. 4.  Defense counsel conceded at the hearing that "if [the employees plaintiffs' counsel contacted] were to tell [defense counsel], as counsel to the

defendant, that they want [counsel] to settle this case," defense counsel "would have to consult [Gardaworld's] internal counsel," and would not take the contacted employees' decision as binding. Feb. 24 Hr'g Tr. 10:23-11:3. Accordingly, defense counsel needed look no further than the commentary to the very rule defendant accused plaintiff of violating to see that plaintiffs' counsel's actions were well within the rule's bounds.

Second, plaintiffs' counsel's simultaneous representation of the putative class representatives in these cases and individual plaintiffs in other, similar cases does not create a conflict of interest. *See* Def.'s DQ Mot. at 9.[13] Defendant cites *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999), for the proposition that "representing GardaWorld employees in two separate class actions and fifteen individual plaintiff cases" inherently creates a conflict of interest justifying disqualification from representing the putative class. Def.'s DQ Mot. at 10. *Ortiz*, an asbestos litigation case, however, involved facts not applicable here that created the impermissible conflict of interest. Putative class counsel had represented tens of thousands of plaintiffs in obtaining judgments or settlements against the defendant asbestos producer, but the asbestos producer was mired in separate litigation with its insurers, making immediate payment to these individual plaintiffs infeasible. *Ortiz*, 527 U.S. at 824. Eventually, plaintiffs' attorneys reached a

---

[13]     Defendant's disqualification motion also half-heartedly asserted that plaintiffs' counsel has conflicts of interest because "the protraction and proliferation of litigation [against defendant] is part of Plaintiffs' Counsel's scheme to accrue attorneys' fees" and because "Zelikovitz has made himself a material witness" by submitting a declaration in support of plaintiffs' motion for class certification discussing how many potential class members he had spoken with. Def.'s DQ Mot. at 10-11. As to the first reason, despite the distaste implied in defendant's language used to describe a "scheme to accrue attorneys' fees," nowhere does defendant explain how or why plaintiffs' counsel's desire to be paid for representation of clients in litigation creates a conflict of interest. *See id.* at 10-11. As to the second reason, Zelikovitz's declaration neither creates a conflict of interest in violation of D.C. Rule of Professional Conduct 1.7, nor violated D.C. Rule of Professional Conduct 3.7, which prohibits a lawyer from appearing at "trial" when the lawyer is "likely to be a necessary witness," because Zelikovitz's declaration was submitted in support of class certification to summarize the many putative class member declarations also attached to the motion and to explain the reasons plaintiffs were seeking class certification and why the requirements for class certification under Federal Rule of Civil Procedure 23—numerosity, typicality, adequacy, and commonality—were met. *See* Pls.' Class Cert. Mot., Ex. 47, Decl. of Justin Zelikovitz, ECF No. 46-12. This does not make Zelikovitz a witness to material facts conflicted out of representing individual plaintiffs or the putative class.

trilateral agreement with the asbestos-producer defendant and the insurance companies, in which a defined amount of money, $1.525 billion, to which both defendant and the insurers contributed, would be devoted to asbestos claims against defendant, used first to pay unpaid, existing claims (many of which were held by class counsel's individual clients), with the residual devoted to a limited fund to pay a class defined by the settlement as anyone who, in the future, brought claims against defendant for asbestos injuries. *Id.* at 824-25. The class counsel and defendant then sought certification of this mandatory class. *Id.* at 825. Class counsel's interests were severely conflicted because they had found a way to get the insurance providers and defendant to pay persons who had already filed suit and obtained awards against the defendant, even if that meant placing an absolute limit on the total recovery of an undefined number of class members they also purported to represent. *Id.* at 852-53. The negotiation between defendant and class counsel was not "arms-length" because class counsel "had a great incentive to reach any agreement" that would get their existing, individual clients paid, even at the expense of capping awards to any future claimants in the class, whereas defendant (and the insurers) had an incentive to cap their total liability. *Id.* at 852.

In the instant case, defendants have pointed to no similar direct conflict between plaintiffs' counsel's individual clients and potential class client for the obvious reasons that here, there is no capped amount of money that can be recovered, no mandatory class is sought, and individual plaintiffs are not competing with class plaintiffs for anything. As support for its remarkably broad reading of *Ortiz* to bar simultaneous representation of class and individual plaintiffs even when no such identifiable conflicts are present, defense counsel cites a single Northern District of California case, Def.'s DQ Mot. at 10 (citing *Lou v. Ma Laboratories, Inc.*, No. 12-cv-5409 (WHA), 2014 WL 68605 (N.D. Cal. Jan. 8, 2014)). At the same time, defense counsel entirely omits adverse

authority from that very same district rejecting *Lou*'s broad interpretation that *Ortiz* forbids lawyers from representing both class and individual claims against the same defendant, *see Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1044-47 (N.D. Cal. 2014); *see also* Feb. 23 Hr'g Tr. at 21:14-16 (Jakubowski stating that "I personally did not do that research, but I reviewed the briefing.  So until I saw plaintiffs' brief, I was not aware of that authority.").  *Lou* is, to say the least, an outlier, and indeed, defendant could point to no other case reading *Ortiz* to categorically prohibit simultaneous class and individual representation without a specifically identified conflict of interest, and defendant has identified no such conflict here.

Third, defendant asserts that, by representing eighteen of defendant's employees in wage-and-hour disputes, plaintiffs' counsel has engaged in a "demonstrable misuse of the judicial process, designed to harass [defendant] with litigation costs," Def.'s DQ Mot. at 4, 13 (emphasizing plaintiff's counsel's filing of "***EIGHTEEN*** cases . . . against GardaWorld asserting similar claims" (emphasis in original)).  While eighteen employees willing to file suit against their employer may seem to be no small number, in context, this is mere fraction of defendant's "approximately 132,000" employees worldwide, including "656 people" in the District of Columbia. *See* Decl. of Jonathan Piccolo, Def.'s D.C. Area Vice President ("Piccolo Decl.") ¶¶ 4, 6, ECF No. 67.  Presumably each and every one of those D.C. employees who is similarly positioned to the instant plaintiffs could bring a similar, individual claim.  That plaintiffs' counsel represents a miniscule fraction—only eighteen—of defendant's employees is no evidence at all that plaintiffs' counsel has "use[d] means that have no substantial purpose other than to embarrass, delay, or burden" defendant, as prohibited by D.C. Rule of Professional Conduct 4.4(a).  In any event, the measure of whether these lawsuits are vexatious and a "misuse of the judicial process," as defendant asserts, can be taken by assessing the viability of the claims asserted, rather than by

the number of employees who believe defendant has failed to pay them wages owed. By this measure, at least in assessing the claims at issue in the two lawsuits before this Court, none of the claims asserted is frivolous.

Fourth, fifth, and sixth, defendant asserts that plaintiffs' counsel has in various ways violated D.C. Rule of Professional Responsibility 3.3, which prohibits a lawyer from "knowingly . . . mak[ing] a false statement of fact or law to a tribunal." D.C. Rule of Professional Conduct 3.3(a)(1); *cf.* Def.'s DQ Mot. at 13-15. Specifically, defendant argues plaintiffs' counsel violated this rule by (1) filing a "frivolous lawsuit" in D.C. Superior Court alleging that defendant violated the confidentiality provision of parties' arbitration agreement, *see supra* n.4; (2) "relying on evidence that is inadmissible" by submitting in support of plaintiffs' motions for partial summary judgment and class certification, an administrative determination by the D.C. Office of Wage-Hour in a separate case against defendant; and (3) "placating the Court" by telling other Judges that plaintiffs in other cases against defendant would opt out of any class certified in the instant cases. Def.'s DQ Mot. at 13-15. How or why the first two challenged actions constitute "false statement[s] of fact or law to a tribunal" is far from clear. D.C. Rule of Professional Conduct 3.3(a)(1). As to the third challenged action, plaintiffs' counsel cannot be shown to have lied about whether individual plaintiffs would opt out of any class in this matter, when no such class has yet been certified and, thus, whether or which of these plaintiffs may even be eligible to join the class remains uncertain. That some of these individual plaintiffs filed declarations in support of class certification to show, for instance, numerosity or typicality, does not indicate their ultimate choice, if eligible, to opt in or out should a class be certified. *Cf.* Def.'s DQ Mot. at 15. In short, none of these actions demonstrate a lack of candor to the court.

### 3.   Defense Counsel's Actions Are Sanctionable

Defense counsel's effort to impugn the reputation of plaintiffs' counsel by calling their ethics into question has boomeranged.  In addition to being meritless, defendant's disqualification motion and defense counsel's actions surrounding its filing and prosecution "multiplie[d] the proceedings in [this] case unreasonably and vexatiously," warranting payment of attorneys' fees and costs reasonably expended by plaintiffs in responding to the motion.  28 U.S.C. § 1927. "Attorney behavior must be *at least* 'reckless' to be sanctionable under [§ 1927]."  *United States v. Wallace*, 964 F.2d 1214, 1217 (D.C. Cir. 1992) (emphasis in original).  Typically, that will involve either "repeated or singularly egregious" behavior.  *Id.* at 1220.

Defense counsel now "acknowledge[s] that they should have engaged in a fulsome meet and confer process and conducted more thorough legal research before filing the Motion to Disqualify."  Def.'s Sanctions Opp'n at 1.  That is undoubtedly true.  The problems do not end, however, with defense counsel's failure to conduct sufficient research but are compounded by the contents, timing, and context of defense counsel's motion and communications with plaintiffs' counsel, all of which indicate behavior that was indeed at least reckless and rose, at times, to bad faith.

First, the disqualification motion filed by defense counsel accuses plaintiffs' counsel of numerous ethics violations, often without any serious explanation of how plaintiffs' counsel's behavior violated the cited ethics rules and, as explained above, often in direct contravention of either the language of the ethics rules themselves or of case law interpreting them.  When an attorney signs any motion, as Jakubowski and Calandra both did, *see* Def.'s DQ Mot. at 2, they "certif[] that to the best of [their] knowledge . . . , formed after an inquiry reasonable under the circumstances[,] . . . the claims, defenses, and other legal contentions are warranted by existing

32

law or by a nonfrivolous argument for extending, modifying, or reversing existing law." FED. R. CIV. P. 11(b)(2). This directive appears particularly important when, as here, the filing attorney is accusing opposing counsel of repeated unethical conduct not only in the instant case but also in other cases pending in this and other courts. Defendant's motion does not contain one meritorious accusation against plaintiffs' counsel, which likely explains defense counsel's belated attempt to withdraw the motion after only 20 minutes of defending this motion in court. Filing such a motion was, at the very least, reckless.

Second, the timing of the motion and defendant's actions thereafter demonstrate that the motion was filed "for tactical reasons." Feb. 24 Hr'g Tr. at 2:21. The motion was filed two days before plaintiffs' reply brief in support of their motion for summary judgment was due. When plaintiffs did not immediately jump into action to oppose the disqualification motion—since they had fourteen days to file any response to defendant's disqualification motion, *see* D.D.C. Local Civil Rule 7(b)—Calandra came back on the day of plaintiffs' summary judgment reply deadline, threatening to file that evening similar motions in all 18 cases plaintiffs' counsel is currently prosecuting against defendant. Email from Calandra to Zelikovitz & Tucker (Feb. 18, 2026, 10:10 AM). Plaintiffs' counsel responded that morning by reminding Calandra of his ethical obligations to disclose adverse authority, pursuant to D.C. Rule of Professional Conduct 3.3(a)(3). Email from Zelikovitz to Calandra (Feb. 18, 2026, 11:41 AM). Defense counsel then waited until after 5:30 PM that day, at which point he demanded that plaintiffs' counsel provide any adverse authorities more or less immediately—on the evening of plaintiffs' summary judgment reply deadline—or else defendant threatened to file 17 more disqualification motions against plaintiffs' counsel in this Court and D.C. Superior Court. Email from Calandra to Zelikovitz (Feb. 18, 2026, 5:43 PM). Plaintiffs' counsel complied with this demand, Email from Zelikovitz to Calandra (Feb. 18, 2026,

33

6:18 PM), after which defense counsel apparently thought better of filing its meritless motions before other Judges. The timing of defendant's disqualification motion two days before the summary judgment reply deadline appeared calculated to distract plaintiffs' counsel from completing work on their summary judgment reply. Then defense counsel upped the ante on the night of plaintiffs' deadline, audaciously demanding that plaintiffs' counsel immediately do research for defense counsel to avoid further harm to plaintiffs' firm's reputation. This constitutes clear and convincing evidence of bad faith behavior by defense counsel.

Third, context after the filing of defendant's motion bolsters the conclusion that defendant's disqualification motion was in bad faith. After filing a legally meritless motion and demanding plaintiffs' counsel's attention immediately prior to an important briefing deadline, defense counsel offered to withdraw the motion—if only plaintiffs would withdraw multiple pieces of evidence submitted in support of their motions. Email from Calandra to DCWageLaw (Feb. 20, 2026, 12:38 PM). Only after an emergency hearing was scheduled and plaintiffs' deadline had passed, was defense counsel interested in "deescalat[ing] the situation" and "focus[ing] on the merits of this matter," particularly if doing so meant knocking out evidence unfavorable to defendant. *Id.* This tactical use of a disqualification motion to distract plaintiffs' counsel and extract substantive litigation concessions is unacceptable.

These actions unreasonably multiplied proceedings, requiring six total briefs by the parties and two days of hearings while this Court was also presiding over a criminal jury trial. *See* 28 U.S.C. § 1927. Defense counsel is therefore directed to pay the attorneys' fees and costs associated with responding to and seeking sanctions for the disqualification motion.

### 4.   Amount of Attorneys' Fees

Attorneys' fees and costs awarded under § 1927 must be "reasonabl[e]."  28 U.S.C. § 1927. Plaintiffs seek $172,566.90 in attorneys' fees and $68.20 for the cost of procuring the hearing transcript.  Pls.' Sanctions Mot. at 22.  Plaintiffs base this total on the LSI *Laffey* matrix, initially adopted in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), and sometimes also referred to as the *Salazar* matrix.  *See* Pls.' Sanctions Mot. at 21-22.

As to the number of hours expended, plaintiffs' counsel explains that two attorneys are employed by DCWageLaw.  Decl. of Justin Zelikovitz, Pls.' Counsel ("Zelikovitz Decl.") ¶¶ 3-4, ECF No. 74-1.  Justin Zelikovitz has been practicing law since 2008 and Jonathan Tucker has been practicing law since 2009, making both their rates on the *Laffey* matrix $1,019 per hour.  *Id.* ¶¶ 3, 4.  Additionally, Cesar Coello is a paralegal whose *Laffey* rate is $277 per hour.  *Id.* ¶ 5.  Cricelia Calderon Sandoval is a "senior legal assistant" for whom plaintiffs also claim a *Laffey* rate of $277 per hour.  *Id.* ¶ 6.  Plaintiffs provide a detailed time log billed in six-minute increments, for responding to defendant's motion to disqualify on an emergency basis, and preparing and supporting plaintiffs' sanctions motion.  Zelikovitz Decl., Ex. 1, Time Log, ECF No. 74-1 at 4. Additionally, plaintiffs bill for time these two attorneys spent in court during the two days of hearing which, due the emergency basis on which the hearing was requested, were conducted in the recesses of an ongoing criminal trial before the Court.  Feb. 23 Hr'g Tr. 3:22-23.  Finally, plaintiffs indicate they expended $68.20 to obtain the hearing transcript.  Pls.' Sanctions Mot. at 22.

Plaintiffs' counsel's billing appears reasonable, given that defendant asserted six bases for disqualification and threatened to apply those same bases across eighteen cases of a two-lawyer firm, which plaintiffs' counsel characterizes as an "existential threat" to the firm.  *Id.* at 8.

Additionally, due to the Court's congested calendar and long-scheduled criminal jury trial taking place that week, both of DCWageLaw's two attorneys sat in court for a day and a half while the Court heard from parties in this matter as time was available. At the conclusion of the second day, Zelikovitz stated that, due to this matter, "we're behind on everything at this point." Feb. 24 Hr'g Tr. at 30:15-17. The sum requested by plaintiffs is reasonable for responding to such a serious motion on a short timeframe.

Defense counsel squabbles with various aspects of plaintiffs' attorneys' fees estimate. They argue that the *Laffey/Salazar* matrix should not be used, in favor of the *Fitzpatrick* matrix. Def.'s Sanctions Opp'n at 16. The DCWPCL requires use of the *Laffey/Salazar* matrix for attorneys' fees when plaintiffs prevail in cases under those statutes, *see* D.C. Code § 32-1308(b)(1), and the legislative judgment that plaintiffs' attorneys' hours should be valued at the *Laffey/Salazar* rates in wage-and-hour disputes is persuasive that these rates are appropriate even pre-judgment where plaintiffs have not yet "prevail[ed]." D.C. Code § 32-1308(b)(1). The *Laffey/Salazar* rates are reasonable in this context.

Defense counsel also argues that Cricelia Calderon Sandoval should not be able to bill at the "paralegal" rate under the *Laffey* matrix because her job title is "senior legal assistant." Def.'s Sanctions Opp'n at 16 n.12. Courts have analyzed the appropriateness of applying the "paralegal" billing tier not based on job title, but based on function, and in any case have treated "legal assistant" and "paralegal" as interchangeable. *See Rawlings v. Dist. of Columbia*, No. 24-cv-2122 (SLS), 2025 WL 1432278, *9 (D.D.C. May 19, 2025) ("A paralegal or legal assistant is a person 'qualified by education, training or work experience who is employed or retained by a lawyer, law office, corporation, governmental agency or other entity and who performs specifically delegated substantive legal work for which a lawyer is responsible.'" (quoting *McAllister v. Dist. of*

*Columbia*, 21 F. Supp. 3d 94, 105 (D.D.C. 2014))); *Tillman v. Dist. of Columbia*, 123 F. Supp. 3d 49, 59 (D.D.C. 2015) (finding that billing a "paralegal" and "legal assistant" both at the "paralegal" rung of the *Laffey* matrix was appropriate).  Defense counsel cites to no case where a court declines to apply the paralegal rung of the *Laffey* matrix merely because a person was called a "legal assistant."

Finally, defendant nitpicks plaintiffs' billing, arguing that certain entries constitute "block billing" or impermissibly incorporate tasks related to plaintiffs' summary judgment reply brief. Def.'s Sanctions Opp'n at 17.  This is a problem defense counsel created for themselves by forcing plaintiffs' counsel to respond on a compressed timeline to defendant's disqualification motion with the threat of seventeen additional disqualification motions across multiple cases in this and other courts.  Defense counsel's tactical timing in filing the disqualification motion precisely when plaintiffs' counsel had to prepare for the filing of plaintiffs' summary judgment reply brief means that plaintiffs' counsel can hardly be blamed for letting these two tasks run together between February 16 and February 18.  Plaintiffs also underbill in some regards, leaving several time entries out of their total estimate, including the time that plaintiffs' counsel's firm's entire staff showed up and sat through the hearings in which their own reputations were on the line.  *See* Time Log at 7-8.  Plaintiffs also bill nothing for time spent preparing the reply in support of the sanctions motion. *See* Pls.' Sanctions Reply at 12.  Defense counsel's desire to consume even more judicial resources dissecting plaintiffs' reasonable and detailed time log is not well taken.

Accordingly, pursuant to 28 U.S.C. § 1927, defense counsel—Adam Calandra, Teresa Jakubowski, and Barnes & Thornburg are directed to promptly reimburse plaintiffs for attorneys' fees and costs associated with plaintiffs' response to defendant's disqualification motion and filing of the sanctions motion, in the amount of $172,635.10.  The D.C. Circuit has upheld § 1927

sanctions against law firms, *see LaPrade v. Kidder Peabody & Co.*, 146 F.3d 899 (D.C. Cir. 1998); *see also Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 147 (2d Cir. 2012) ("We disagree with Arnold & Itkin's assertion that the District Court was without authority under 28 U.S.C. § 1927 to award sanctions against the firm as a whole for the actions of various lawyers." (internal quotation marks omitted)).  That is appropriate here, where the general counsel of Barnes & Thornburg apparently approved the filing of defendant's disqualification motion specifically.  *See* Feb. 23 Hr'g Tr. at 31:6-7 (Jakubowski stating that the disqualification motion was filed "in consultation with our internal general counsel's office"); Feb. 24 Hr'g Tr. at 16:21-22 (Jakubowski stating that defense counsel "ran that by our internal general counsel's office before filing that motion").  The firm and these two counsel are responsible for the costs associated with responding to the meritless disqualification motion.

## IV.    CONCLUSION

For the foregoing reasons, defendant's Motion to Dismiss *Merritt*, *Merritt* ECF No. 30, is **DENIED**; defendant's Motion to Dismiss *Chang*, ECF No. 47, is **GRANTED IN PART** as to Counts I, IV, and V, and **DENIED IN PART** as to Counts II and III; plaintiffs' Motion for Partial Summary Judgment, ECF No. 42, in *Chang* is **DENIED**; plaintiffs' Motion to Certify Class, ECF No. 44, is **DENIED** without prejudice; defendant's motions to strike exhibits from plaintiffs' motions for partial summary judgment and motion for class certification, ECF Nos. 48, 53, are **DENIED AS MOOT**; and plaintiffs' Motion for Sanctions, ECF No. 74, is **GRANTED**.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: June 9, 2026

                                       _____
**BERYL A. HOWELL**
United States District Judge